Jerry B. HODGEN and Bobby Sue Hodgen, Plaintiffs,

v.

FOREST OIL CORP., et al., Defendants,

FOREST OIL CORP. and Ronald J. Doucet, Defendants–Third Party Plaintiffs–Intervenor Defendants–Cross Claim Plaintiffs–Appellants–Cross-Appellees,

FOREST OIL CORP., in its capacity as platform owner and Ronald J. Doucet, Defendants–Third Party Plaintiffs–Intervenor Defendants–Cross Claim Plaintiffs–Appellants–Cross-Appellees,

v.

A & A BOATS, INC., and C & G Marine Service, Inc., Defendants–Third Party Plaintiffs–Intervenor Defendants–Cross Claim Defendants–Cross Claim Plaintiffs–Appellees–Cross Appellants,

v.

OPERATORS & CONSULTING SERVICES, INC., Third Party Defendant–Cross Claim Defendant–Appellee, and Chancellor Insurance Co., et al., Third Party Defendants–Appellees,

v.

ALBANY INSURANCE CO., Third Party Defendant–Third Party Plaintiff–Appellee–Appellant,

v.

AETNA CASUALTY & SURETY CO., Intervenor Plaintiff–Third Party Defendant–Appellee.

No. 94–41244.

United States Court of Appeals, Fifth Circuit.

June 27, 1996.

Carl J. Hebert, Michael W. Mallory, Evans & Co., New Orleans, LA, for Forest Oil & Ronald J. Doucet.

Donald C. Brown, Todd M. Ammons, Robert W. Fenet, Woodley, Williams, Fenet, Boundreau, Norman & Brown, Lake Charles, LA, for Forest Oil, in its capacity as Platform Owner & RJD.

Edward F. LeBreton, III, Cindy T. Matherne, Rice & Fowler, New Orleans, LA, for Albany appeal as to AETNA & OCS and Albany as to Forest–Oil–RJD & Forest Oil in its capacity.

John F. Emmett, James A. Cobb, Jr., Emmett, Cobb, Waits & Kessenich, P.C., New Orleans, LA, for A & A and C & G.

D. Kirk Boswell, Stephen E. Mattesky, John A. Scialdone, Terriberry, Carroll & Yancey, New Orleans, LA, for A & A, C & G & COMMERCIAL UNION, Commercial Union, Appellee only.

Bonnie M. Steiner, James R. Sutterfield, Nathan L. Schrantz, Hoffman, Sutterfield & Ensenat, New Orleans, LA, for Chancellor, et al.

Ben E. Clayton, Lenfant & Assoc., Metairie, LA, Kevin J. Koenig, Raggio, Cappel, Chozen & Berniard, Lake Charles, LA, for Aetna.

Richard J. Guidry, Paul B. David, Broussard, David & Daigle, Lafayette, LA, for Operators & Consulting Serv.

Before POLITZ, Chief Judge, and HIGGINBOTHAM and SMITH, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This case, which involves at least thirteen separate lawsuits among at least fourteen parties, presents once again the legal difficulties attending a personal injury to a worker involved in capturing oil and mineral resources off the coast of Louisiana. At issue are the validity of the district court's assignments of comparative fault, the enforceability of a standard indemnity clause between a platform owner and a service contractor, and the effectiveness of other insurance clauses in the multiple layers of insurance each of the principal defendants in this case have purchased. We divide our opinion into three parts corresponding to these three primary issues. We affirm the district court's holdings on the comparative fault and indemnity questions, with the exception of one question that we certify to the Louisiana Supreme Court. Finding that the resolution of the disputes concerning the other insurance clauses in the policies requires powerful policy choices of state law, we also certify the insurance issue to the Louisiana Supreme Court.

## I

### A

Forest Oil Corp. owned several oil platforms in the Gulf of Mexico, including the Vermillion group 255, located on the Outer Continental Shelf. Pursuant to a Blanket Time Charter, Forest chartered the M/V MISS DEBORAH in a non-demise [1] fashion from the vessel's owners and operators, A & A Boats, Inc. and C & G Marine, Inc., respectively (collectively "A & A"). The master of the MISS DEBORAH was Captain Arthur Flanders. Pursuant to a Master Service Agreement, Forest hired Operators & Consulting Services, Inc. (OCS) to provide platform technicians and other staff for certain aspects of the operation of the platforms.

Jerry Hodgen worked as an operator for OCS. OCS assigned him for a single hitch, a seven day period, to Forest's Vermillion 255 platform group. The Vermillion 255 group

---

1. In a "non-demise" charter, the owner of the ship remains in control of the vessel and pro-vides the crew. *Forrester v. Ocean Marine Indemnity Co.*, 11 F.3d 1213, 1215 (5th Cir.1993).

consisted of four platforms; the mother platform was 255–B, where the workers slept and lived. It stood some two to three miles away from 255–A, where Hodgen's accident occurred. When Hodgen arrived at 255–B, he reported to Ronald Doucet, a Forest employee. Hodgen took orders from Doucet for the duration of his hitch.

On the morning of May 5, 1991, Hodgen, Doucet, and coworker Randy Ardoin rose on 255–B early. The schedule for the day called for Hodgen and Ardoin to travel via the MISS DEBORAH to 255–A for meter readings, but the seas were 7–9 feet. All three men knew that 255–A had no crane equipped for transfer from a boat to the platform via personnel basket, and thus that the only means of transfer was via helicopter or via swing rope from the MISS DEBORAH. Hodgen and Ardoin told Doucet that they did not feel able to make the swing rope transfer on and off 255–A in such rough seas and requested that Doucet call the helicopter that Forest had hired to assist in mining activity. Doucet responded that the helicopter was unavailable and told Hodgen and Ardoin to "give the vessel a try" because he had to report the meter readings to the home office soon. No emergency or urgency in fact attached to the meter readings, which might easily have been taken later in the day when the helicopter was available without interrupting the functioning of the oil operation. After conferring via radio with Captain Flanders, Doucet ordered the MISS DEBORAH to transport Hodgen and Ardoin to 255–A. Fearing the loss of their jobs, the two men complied. They boarded the MISS DEBORAH via personnel basket, sailed to 255–A, and successfully completed the swing rope transfer onto 255–A. After taking their readings, Ardoin and Hodgen attempted to swing back to the MISS DEBORAH. Ardoin completed the swing without incident. When Hodgen attempted to do so, however, the MISS DEBORAH rose quickly as Hodgen landed. Hodgen's impact on the boat caused him to suffer damage to his spinal

cord, which in turn resulted in partial paralysis and an inability to control certain body functions.

Hodgen sued Forest, Doucet,[2] and A & A in Louisiana state court, alleging that the negligence of these two entities caused his injuries. Forest and A & A removed, alleging that the suit arose under the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1301–56. *See especially* 43 U.S.C. § 1349(b)(1). Although the original petition did not specify a theory of recovery, the district court construed the suit as proceeding pursuant to two different bodies of law. As against A & A and Forest in its capacity as time charterer of the MISS DEBORAH, the court held that Hodgen's complaint alleged a claim under the Longshore and Harbor Worker's Compensation Act, 33 U.S.C. §§ 902(21), 905(b–c), made available to Hodgen by 43 U.S.C. § 1333(b). As against Forest in its capacity as platform owner, the court construed Hodgen's claim to be under Louisiana law applicable by 43 U.S.C. § 1333(a)(2)(A)'s incorporation of the law of the adjacent state. *See generally Rodrigue v. Aetna Casualty Co.,* 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969).

The district court found that "Doucet was negligent in sending plaintiff onto a vessel in these rough conditions, especially when a helicopter could just as easily have been used and there were no compelling circumstances present." *Hodgen v. Forest Oil Corp.,* 862 F.Supp. 1552, 1556 (W.D.La.1994). The court held that the actions of Doucet "constituted negligence of Forest Oil as charterer of the [MISS DEBORAH]," *id.,* then absolved Forest of all negligence in its role as platform owner.[3] The court further found that Captain Flanders' failure to stop the swing rope transfer from occurring on such high seas constituted negligence as well, and therefore found for Hodgen in his suit against A & A. Regarding comparative fault, the court held "that the actions of Forest were a far greater causative factor in

---

**2.** Following the court below, we treat Forest and Doucet as a single party.

**3.** The district court also held that Hodgen was the borrowed employee of Forest at the time of

the accident. *See Doucet v. Gulf Oil Corp.,* 783 F.2d 518, 522–23 (5th Cir.) *cert. denied,* 479 U.S. 883, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986).

the accident than that of A & A/C & G. As time charterer, Forest was the party directly responsible for using the vessel for this trip in rough seas." *Id.* at 1558. The district court then assigned 85% of the fault to Forest and 15% of the fault to A & A. After calculating damages, the court ordered Forest and A & A to pay according to their respective shares of fault.

### B

Hodgen settled all claims with all parties and dismissed his suit with prejudice. This left issues regarding indemnity and insurance. Because the assignments of fault provide the baseline for the adjudication of indemnity and insurance issues, however, Forest appeals the judgment in favor of Hodgen. Forest contends that the district court erred in holding it responsible for 85% of the fault. First, citing *Brown v. Link Belt Division of FMC Corp.*, 666 F.2d 110, 113–14 (5th Cir.1982), and *Forrester v. Ocean Marine Indemnity Co.*, 11 F.3d 1213 (5th Cir.1993), Forest argues that absent special circumstances a time charterer owes no duty to provide a safe means of ingress and egress to the chartered vessel, and that no special circumstances existed in this case. In particular, Forest relies upon the *Forrester* court's unsuccessful search for any case "in which a time charterer is held liable for the safe embarkation or disembarkation of passengers, absent special circumstances." 11 F.3d at 1216. Second, Forest contends that assuming such a duty, the district court nevertheless erred in assigning it the majority of the fault. Forest asserts that maritime law places a high duty of care upon the master to make an independent assessment of the safety of the means used to transfer on and off a vessel, and that Captain Flanders breached the duty in this case by failing to make an independent assessment of the risk. Forest further asserts that Flanders was in a superior position to evaluate the risk because he was near platform 255–A at the time of the accident, while Doucet was 2–3 miles away on 255–B.

### C

We find neither of Forest's arguments convincing. We refuse to reach Forest's first argument because the district court's judgment against Forest did not rest upon a time charterer's duty to provide a safe means of transfer to the vessel. We also hold that the district court committed no clear error by assigning the majority of the fault to Forest.

### 1

Our cases addressing the existence and scope of a time charterer's duty to third parties, persons, or entities other than the vessel subject to the charter, lack a precise consistency. As Forest notes, our cases suggest that absent special circumstances the vessel, not the time charterer, owes a duty to provide a safe means of ingress and egress for passengers. These cases represent an application of the doctrine that "the master of every vessel in navigation, regardless of how small, [is] the 'lord of his little world.'" *Guillory v. Ocean Drilling & Exploration Co.*, 433 F.2d 833, 836 (5th Cir.1970) (quoting *United Geophysical Co. v. Vela*, 231 F.2d 816, 819 (5th Cir.1956)). Nevertheless, our cases also suggest that a time charterer owes a hybrid duty arising from tort and contract law to exercise the control the charter affords it over the timing, route, and cargo of a vessel's journey in a reasonably prudent manner. The district court held that Forest labored under, and breached, this second duty.

### a

At least as early as 1969, this court's cases recognized that a master's control over matters relating to his vessel did not translate into an exclusive duty of reasonable care when common sense and economic reality suggested that a second entity also exercised control within certain portions of this same sphere of activity. *See Massey v. Williams–McWilliams, Inc.*, 414 F.2d 675, 679 (5th Cir.1969), *cert. denied*, 396 U.S. 1037, 90 S.Ct. 682, 24 L.Ed.2d 681 (1970). *Massey* involved a transfer between two ships, and thus two lords, but subsequent cases, beginning with *Brown v. Link Belt Division of FMC Corp.*, 666 F.2d 110 (5th Cir.1982), extended this principle to the relationship between a charterer and a vessel.

Before *Brown*, however, we decided *M.O.N.T. Boat Rental Services, Inc. v. Union Oil Co.*, 613 F.2d 576 (5th Cir.1980). In *M.O.N.T.*, a time charterer requested that the chartered vessel proceed out into rough seas, and a member of the crew was injured. The crewmember sued the vessel and won. The vessel then brought an action for contract and tort indemnity against the charterer. After ruling that no claim of contractual indemnity would lie because of a peculiar clause in the charter, we held that tort indemnity was also unavailable because the time charterer's request that the ship conduct the mission "if negligent at all ... was ... not active or primary negligence relative to [the vessel's] negligence." 613 F.2d at 581–82.

Two years later came *Brown*. In *Brown*, the charterer[4] instructed the vessel captain to make a transfer to an oil platform over the objection of the vessel master that rough weather made the transfer unsafe. An accident resulted, and the injured passenger sued. We refused to absolve the time charterer of responsibility for its instruction despite the well-recognized principle that "normally the master of a ship has the final say so in deciding what risks posed by the weather and the condition of his ship will be assumed." 666 F.2d at 113. Instead, we held that because the practice between the charterer and the vessel had given the charterer "primary responsibility for determining whether to transfer passengers," and because the charterer was "in as good a position as the master to assess the difficulty of the task," the charterer owed a duty to the passenger to exercise its primary responsibility in a reasonable manner. 666 F.2d at 113–14.

One year later, we held that the law imposed a duty upon a time charterer outside the narrow circumstances articulated in *Brown*. Although *Helaire v. Mobil Oil Co.*, 709 F.2d 1031 (5th Cir.1983), primarily concerned a separate issue, we held that a particular entity's negligence "was based on its actions or omissions in permitting the un-

loading of cargo on [a] vessel to continue despite the obvious danger created by poor weather conditions," and thus, that the finding of liability to a roustabout who was injured while unloading cargo corresponded to the entity's role as time charterer, not as platform owner. *Helaire* thus imposed a duty upon a time charterer to refrain from ordering cargo unloaded when weather conditions made the unloading unsafe.

Three years later we appeared to depart from this evolving pattern. In *Smith v. Southern Gulf Marine Company No. 2, Inc.*, 791 F.2d 416 (5th Cir.1986), a platform owner time chartered a vessel to aid in transporting workers from shore to platform. The time charterer ordered the vessel to transport the workers out to the platform in rough seas when weather prevented the use of a helicopter. Anticipating that not all of the passengers were seasoned seamen, the vessel crew handed out garbage bags. The number of garbage bags was insufficient, and the toilet easily accessible to the passengers was out of order. A platform worker was injured when he slipped on vomit. He sued the time charterer, seeking "to prove that [the time charterer] was responsible for the decision to transport the relief workers by crewboat in rough weather and was therefore also responsible for any consequential injuries that occurred." 791 F.2d at 419. We held that this theory would not suffice to hold the time charterer liable, stating in broad terms that "[t]he ultimate decision about whether to proceed, however, rested with the crewboat captain.... [The time charterer] requested the alternative travel arrangement, but it could not override the judgment of the crewboat captain about the risk of making the trip." *Id.* We then added that in any case the decision to send the vessel out in those seas was "not unreasonable." *Id.*

Two cases decided the next year, however, made clear that *Smith* had not relieved a time charterer of all tort responsibility for its decisions regarding the chartered vessel. In the first, *Graham v. Milky Way Barge, Inc.*, 824 F.2d 376 (5th Cir.1987), four platform

---

4. The charter in *Brown* was a bareboat charter. Because the charterer hired a third company to provide the crew, however, the extent of the charterer's control over the vessel's operations was similar to that provided for in a standard non-demise time charter.

workers were injured or killed when the weather roughened unexpectedly, causing the waves to capsize a jack-up barge chartered to the owner of a nearby platform. The district court held the time charterer 30% liable on the ground that it had dispatched the barge into unsheltered waters, then failed to broadcast reports of the impending bad weather. We affirmed. We cited *M.O.N.T.* and commented that "there is a distinction between a time charterer's potential liability under the time charter and independent tort liability which is not governed by the time charter. In addition, general principles of maritime negligence govern maritime torts." 824 F.2d at 388. Thus, we recognized in *Graham* that the time charterer's duty to persons or entities not parties to the charter does not stem solely from the charter itself, which is a contract, but must also spring from independent principles of tort law.

We further refined the concept of this hybrid tort-contract duty in the second of the 1987 cases, *Kerr–McGee Corp. v. Ma–Ju Marine Services, Inc.*, 830 F.2d 1332 (5th Cir. 1987), by focusing on the importance of control. In *Kerr–McGee*, a platform worker slipped and fell on a vessel in transit to a platform. The platform worker sued both the vessel and the time charterer, complaining that the vessel lacked adequate handrails, non-skid paint, and gently sloped steps, and that the master had negligently rammed the vessel against the platform. We held that the time charterer owed no duty to the passenger because "the defendant's legal relationship to the vessel [did] not impose the right and duty of control" over the conditions and activities giving rise to the plaintiff's suit. 830 F.2d at 1343. We focused on "the legal control and responsibility imposed by the particular relationship" provided for in the charter and concluded that a time charterer's contractual and traditional control over the cargo, route, and timing of a vessel's mission did not extend to the safety or seaworthiness of the vessel. *Id.* Nevertheless,

we pointed out that the charterer "has some responsibilities." 830 F.2d at 1341. Thus, because the charterer "designate[d] the cargo that the chartered vessel carr[ied]," it might be held liable for "carelessly choos[ing] an unsafe combination of cargo to share the same hold." *Id.*[5]

Two subsequent cases applied the *Kerr–McGee* focus on control to accidents arising from a passenger's transfer to and from a vessel. In *Moore v. Phillips Petroleum Co.*, 912 F.2d 789 (5th Cir.1990), a platform worker suffered injuries when a swing rope broke during a swing rope transfer from the ship to the platform. The worker sued both his employer in its capacity as time charterer and platform owner and the vessel under the OCSLA and LHWCA. We held that while liability might attach to the platform owner and the vessel, it could not attach to the time charterer, in spite of the fact that the charterer "sent the boat to the fixed platform where the rope was located." 912 F.2d at 792. We justified our conclusion with the observation that "[w]e have never held that a time charterer owes a passenger a duty to take precautions to avoid potentially hazardous means of ingress and egress when the vessel owner, the passenger's employer, or another party controlled the means of ingress and egress." *Id.* We further clarified the *Moore* rule in *Forrester v. Ocean Marine Indemnity Co.*, 11 F.3d 1213 (5th Cir.1993), where we held that absent special circumstances, control of the type addressed in *Kerr–McGee* over the means of ingress and egress to a vessel lies with the vessel owner, not the time charterer, and thus a time charterer normally owed no duty to a disembarking passenger.

In *Moore* and *Forrester* "no evidence connected the cause of the accident to the timing or location of the transfer, factors traditionally within the control of the time charterer." Instead, the cause of the accidents were a broken rope and a dangerous means of transfer; the time charters in neither case gave

---

5. We applied the *Kerr–McGee* focus on control in *In re P & E Boat Rentals, Inc.*, 872 F.2d 642 (5th Cir.1989), in which a time charterer ordered a vessel to operate at high speeds in dense fog. Relying primarily on *Graham*, we held that the time charterer owed a duty to third parties injured in a collision caused by the charterer's order because it had been "negligent in conducting its activities as a time charterer." 872 F.2d at 647.

the charterer control over these two phenomena.

Finally, two years ago, we decided *Randall v. Chevron, U.S.A., Inc.*, 13 F.3d 888 (5th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 498, 130 L.Ed.2d 408 (1994), a case with facts strikingly similar to those in this dispute. In *Randall*, a platform owner requested that its time chartered vessel assist in an evacuation of the platform ordered in response to the impending arrival of a hurricane. The plaintiff, a platform worker, attempted a swing rope transfer to the chartered vessel. After swinging to the vessel, the plaintiff "landed on his feet as the vessel rose with a swell, causing the swing rope to go slack. [The plaintiff] continued to hold onto the rope, and as the vessel fell with the waves, the rope went taut." 13 F.3d at 892. The plaintiff "was then pulled back off the vessel" where he "lost his grip on the rope and fell into the water." *Id.* The district court held the time charterer 25% liable "for directing the vessel to remain in and encounter the treacherous weather conditions that then existed." *Id.* at 893. The time charterer appealed, arguing that "there is no duty on the part of a time charterer to determine whether the mission it assigns can be accomplished safely." *Id.* at 899.

We affirmed. After reviewing several of these cases, we concluded that "[t]he trend of our more recent decisions .. plainly favors imposing a duty of care on a time charterer who orders the vessel he had hired to put to sea in dangerous weather." *Id.* at 900. We distinguished *M.O.N.T.* on the ground that it primarily concerned contractual indemnity and that "the concepts of active and passive negligence have fallen by the wayside with the advance of the comparative negligence doctrine." *Id.* We also commented that "[t]he force of the language in *Smith* suggesting that the time charterer was not responsible for injuries resulting from sending the vessel into rough seas is undercut by that court's agreement with the district court that the time charterer's decision was 'not unreasonable.'" *Id.* (quoting 791 F.2d at 491).[6]

b

We draw several principles from this our precedent. First, in this circuit, *Randall* establishes that a time charterer's duties no longer depend on *M.O.N.T.* concepts of active and passive negligence. That is, a time charterer may be held liable regardless of whether the vessel owes a primary duty or a high standard of care to the injured plaintiff. Second, a time charterer owes a *Graham* duty, a hybrid duty arising from contract and tort, to persons with whom it has no contractual relationship, including vessel passengers, to avoid negligent actions within the sphere of activity over which it exercises at least partial control. *Graham*, *Kerr–McGee*, *P & E*, and *Randall* establish that the traditional spheres of activity in which a time charterer exercises control and thus owes a duty include choosing the vessel's cargo, route, and general mission, as well as the specific time in which the vessel will perform its assignment. Third, *Brown* makes clear that the parties may vary the traditional assignment of control by contract or custom. Fourth, *Kerr–McGee* illustrates that unless the parties have so varied the traditional allocation of responsibility, a time charterer owes no duty beyond these spheres. Fifth, *Moore* and *Forrester* establish that a time charterer's traditional sphere of control does not extend to providing a safe means of ingress and egress from the vessel, absent special circumstances. Sixth, *Randall* makes clear that the fact that a vessel may owe a duty to a third party over a certain sphere of activity does not necessarily mean that this duty is exclusive. Thus, the fact that a vessel owes a duty to a passenger to provide a safe means of ingress and egress does not mean that an accident arising from this activity cannot also be the fault of the time charterer, if the plaintiff can establish that accident resulted in part from a decision, such as the timing of the ingress or egress, within the time charterer's control spheres.

These principles make clear that the district court committed no error in this case.

---

6. Were we to conclude that our cases are in hopeless and unprincipled conflict, we would follow *Randall* as the case with the most analo-gous facts and affirm the district court's imposition of a duty. As the subsequent discussion illustrates, we take a more sanguine view.

Hodgen, Doucet, and Ardoin all knew that the only means of transferring from the MISS DEBORAH to 255–A was via swing rope; although the platform was equipped with a crane, the crane was not of the type used in personnel basket transfers. Doucet knew or should have known that the seas were too rough to make a swing rope transfer safely on that particular morning. Instead, Doucet ordered the chartered vessel to proceed to 255–A and to make the swing rope transfer. As the district court found, there is nothing dangerous in the swing rope transfer in the abstract. What made this transfer dangerous was Doucet's timing; on that particular morning, the seas were seven to nine feet. The timing of the transfer was in Doucet's control in his capacity as the agent of the time charterer of the MISS DEBORAH. Nothing in the time charterer in this case altered the traditional allocation of control over the timing of the mission to the time charterer. Doucet's contractual control over the timing of the MISS DEBORAH's mission gave rise to the hybrid *Graham* duty to choose the moment of the transfer reasonably. Doucet breached this duty. The fact that the vessel captain may also have labored under an independent duty to stop the transfer, a proposition no one disputes in this case, did not prevent the *Graham* hybrid duty from arising.

The only case arguably inconsistent with our reasoning is *Smith.* In *Smith,* one might argue, there was nothing inherently dangerous about the choice to use the boat to transport passengers from the shore to the platform; instead, the timing of the mission gave rise to the risks attending the expected passenger discomfort. Since this timing was in control of the charterer, the *Smith* court's statements regarding the total absence of a duty on the part of the charterer are inconsistent with our view of the case law.

The *Smith* court may have spoken in unnecessarily broad terms, especially given its finding that there was nothing negligent in the choice to use the vessel on those seas. In the alternative, the *Smith* court may have rested on the view that the time charterer was entitled to rely on the vessel's independent responsibility to hand out a sufficient number of garbage bags, repair the passenger bathroom, or take other steps. In other words, although the timing of the trip may have been less than ideal, the trip might still have been made safely, and the means of making trip at this particular time safe were in the control of the vessel, not the time charterer. Such a distinction treads dangerously near to the concepts of active and passive negligence relied on in *M.O.N.T.* and since rejected in *Randall.* As *Randall* implied, the modern approach to such situations is to impose a duty upon both parties having control over the events causing an accident and to translate previous principles of primary and secondary fault into findings on comparative negligence. We read *Smith* in a manner fitting with the pattern of cases decided both before and after it. *See Burlington Northern R.R. v. Brotherhood of Maintenance of Way Employees,* 961 F.2d 86, 89 (5th Cir.1992), *cert. denied,* 506 U.S. 1071, 113 S.Ct. 1028, 122 L.Ed.2d 173 (1993). We find no error in the district court's imposition of a duty upon Forest as time charterer in this case.[7]

2

■ Forest's second argument is that the district court committed clear error by assigning 85% of the fault to Forest. We disagree. Although Captain Flanders, as master of the MISS DEBORAH, may have labored under an independent duty to stop the swing rope transfer in the high seas, the district court could find that Flanders' negligence was less important than that of Doucet, who negligently refused Hodgen's request for the helicopter and sent Hodgen on his mission to 255–A knowing that the only

---

7. The district court also relied in part upon Doucet's refusal to call for the helicopter, finding that this decision was made by Forest in its capacity as time charterer of the MISS DEBORAH. Perhaps because of its separate insurance policies for time charterer and platform owner roles, and because the platform owner insurance attorney litigated the case up to trial on its behalf, Forest affirmatively argued below that any failure to use the helicopter was a decision made in its capacity as a time charterer. Because no party has appealed the district court's reliance on this factor, we make no comment on it.

means of access to the platform was by swing rope and that the seas were too high to complete a swing rope transfer without an unreasonable risk of harm. In particular, we find instructive the unanimous agreement among those trial witnesses knowledgeable in such matters that the most important factor in determining the safety of a swing rope transfer is the assessment of the individual making the transfer. Witness after witness testified that because of the athletic nature of the task and the myriad factors that can make a transfer unsafe, the individual's personal measurement of his own abilities against the surrounding conditions is due great weight. In this case, Doucet knew that Hodgen and Ardoin, both seasoned platform workers and veterans of countless transfers, felt unable to use the swing rope safely in the high seas. No evidence suggests that Doucet shared this knowledge with Captain Flanders. Instead, Doucet ordered Hodgen and Ardoin to "give the boat a try." All agree that Flanders handled the boat as well as could be expected in the high seas, and that his only fault was in failing to stop the transfer. We find no error in assigning the majority of fault to the only party aware of the most important factor rendering the transfer unsafe.

## II

Hodgen's underlying action gave rise to a web of litigation in which OCS, Forest, A & A, and the insurers of each attempted to pin responsibility for paying Hodgen's damages upon someone else. Initially, most of these suits depend on the contractual relationship between Forest and OCS, specifically the enforceability of a clause in the Master Service Agreement, requiring OCS to indemnify Forest in any suit by an OCS employee against Forest arising out of activities conducted pursuant to the Agreement. The district court held that the Louisiana Oilfield Indemnity Act, La.Rev.Stat. § 9:2780.B, made applicable via the incorporation of state law in the OCSLA, 43 U.S.C. § 1333(a)(2)(A), barred enforcement of the indemnity clause. *Hodgen v. Forest Oil Corp.*, 862 F.Supp. 1560 (W.D.La.1994). Forest and A & A, joined in part by their insurers, appeal this ruling. They argue in the main that the OCSLA's

incorporation of state law does not apply to this case, and that federal maritime law allows them to shift liability for their fault onto OCS and its insurers. We affirm.

## A

The Master Service Agreement between OCS and Forest is short. It contemplates that the parties will agree to future orders for the performance of services and does not specify the price or nature of this work. Under the heading "Insurance," OCS agreed "to procure and maintain, at its sole expense ... policies of insurance in favor of Forest ... and [the] 'Forest Group.'" The Agreement defined the "Forest Group" broadly to include any "contractors;" A & A asserts, and OCS does not contest, that it is a member of the Forest Group under the Agreement. The Agreement also provided, "[E]ach policy will name Forest Group as additional insured." Under the heading "Indemnity," OCS agreed to

> indemnify ... Forest Group ... from and against any and all ... defense costs or suits ... by any [OCS] employee ... in any way, directly or indirectly, arising out of or related to the performance of [the Agreement] or the use by [the OCS] employee of ... any ... vessel or other premises[,] including ingress and egress[,] including ... the sole, concurrent, or partial negligence, ... fault or strict liability of Forest Group.

Hodgen's suit against Forest and A & A prompted suits by both against OCS. The two entities sought to use the indemnity clauses in the Agreement to force OCS to pay for their negligence. Both suits also stated causes of action for breach of contract, alleging that OCS had breached the Agreement by failing to name the Forest Group as an additional insured on its insurance policies. Forest and A & A also sued a group of Five Underwriters providing insurance to OCS, alleging that OCS's policy with the Five Underwriters covered the Forest Group. A & A's excess insurer, Albany Insurance Co., sued Aetna Casualty & Indemnity Corp., OCS's workers' compensation carrier, for indemnity and contribution and for a

declaration that Aetna's insurance coverage was primary to that provided by Albany. Late in the litigation, Forest requested leave to sue Aetna, but the district court denied the request. Finally, Forest in its capacity as platform owner sought to recover its defense costs from OCS, alleging that under the doctrine of *Meloy v. Conoco, Inc.,* 504 So.2d 833 (La.1987), it was entitled to recover those costs associated with the defense of defending the suit in its role as platform owner despite the OCSLA and the LOIA because it had been exonerated of all fault in this role.

The district court first addressed whether the OCSLA's assimilation of state law applied to the dispute between OCS and the Forest Group. It divided its analysis into two steps. Relying on the six-factor test articulated in *Davis & Sons, Inc. v. Gulf Oil Corp.,* 919 F.2d 313 (5th Cir.1990), the court first held that the contract between OCS and Forest was non-maritime. In the second step of its analysis, the district court held that the OCSLA's assimilation of state law applied to this case. In this second step of its analysis, the district court relied on the three-part test articulated in *Union Texas Petroleum Corp. v. PLT Engineering,* 895 F.2d 1043, 1047 (5th Cir.), *cert. denied,* 498 U.S. 848, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990): "(1) The controversy must arise on a situs covered by OCSLA (i.e. the subsoil, seabed, or artificial structures permanently or temporarily attached thereto). (2) Federal maritime law must not apply of its own force. (3) The state law must not be inconsistent with Federal law." After finding each factor satisfied, the court held that the OCSLA mandated the application of Louisiana law to the indemnity agreement, and that the LOIA barred all attempts to shift liability from Forest, A & A, and their insurers to OCS and its insurers under theories of an indemnity arrangement, additional insured status, and breach of contract. 862 F.Supp. at 1563–67. In a later order, the court held that the LOIA did not allow Forest as platform owner to recover its defense costs from OCS. *Hodgen v. Forest Oil Corp.,* 862 F.Supp. 1567, 1571 (W.D.La.1994). Finally, the court held that because Forest and A & A could produce no evidence that they had paid any portion of the premiums corresponding to the insurance OCS procured on their behalf, the LOIA exception recognized in *Marcel v. Placid Oil,* 11 F.3d 563 (5th Cir.1994), did not apply. 862 F.Supp. at 1570.

### B

Forest, A & A, and their insurers appeal each of the district court's decisions. Their primary argument is that the district court erred in applying the LOIA because the controversy did not arise on an OCSLA situs. They also argue that because the Agreement was maritime, maritime law applies of its own force. Forest, A & A, and their insurers further contend that the district court erred in not applying the exception of *Marcel v. Placid Oil,* 11 F.3d 563 (5th Cir.1994), because the evidence showed that OCS's insurance premiums did not vary according to the identity of the party named as an additional insured in its insurance policies. Finally, Forest has filed a separate brief in its capacity as platform owner arguing that the district court's holding of no platform fault should entitle it to recover its defense costs from OCS.

### C

We divided our discussion in this phase of the case into two parts. First, we explain our reasons for holding that the OCSLA's assimilation of state law applies to this case. Second, we deal with the arguments of Forest, A & A, and its insurers that the LOIA does not prevent the shifting of costs to OCS and its insurers.

### 1

In assessing the arguments of Forest, A & A, and their insurers regarding the OCSLA's incorporation of state law, we again confront a series of arguably inconsistent cases.[8] The

---

8. We have on previous occasion expressed our frustration with the inconsistency of our case law in this general area. *See, e.g., Campbell v. Sonat* *Offshore Drilling Inc.,* 979 F.2d 1115, 1121 (5th Cir.1992); *Smith v. Penrod Drilling Corp.,* 960 F.2d 456, 460–61 (5th Cir.1992); *Domingue v.*

resulting confusion concerns at least three discrete matters. First, what are the elements of the test to decide whether the OCSLA's incorporation of state law applies in a given case? Second, to the extent that situs is an element of this test, does a controversy dealing with an indemnity clause in a master agreement not specifying the nature of the services to be performed arise on an OCSLA situs? Third, is an agreement of this description maritime or non-maritime?

The difficulty our case law has created, and the proper way to safety, are both evident in the recent opinion in *Wagner v. McDermott, Inc.*, 899 F.Supp. 1551 (W.D.La. 1994), *aff'd*, 79 F.3d 20 (5th Cir.1996). In *Wagner*, a platform welder employed by a service company was injured when he slipped and fell on the deck of a barge moored adjacent to the platform; the barge was used to provide a place for the platform workers to sleep and eat. The welder sued the platform owner, which sought to invoke an indemnity clause in the master contract between it and the service company. The district court first examined whether the contract was maritime under the test of *Davis & Sons, Inc. v. Gulf Oil Corp.*, 919 F.2d 313 (5th Cir.1990), and declared the contract non-maritime. The court then relied on *Domingue v. Ocean Drilling & Exploration Co.*, 923 F.2d 393 (5th Cir.1991), *cert. denied*, 502 U.S. 1033, 112 S.Ct. 874, 116 L.Ed.2d 779 (1992), to hold that "arguably" no further analysis was necessary in that "the indemnity provision involved in the instant case is invalid because land based law, here Louisiana law, applies to the non-maritime contract even if[,] as in the case before this Court, the injury occurs on a vessel." 899 F.Supp. at 1556 (alteration added).

Understandably reluctant to rely solely on this line of reasoning in light of our case law, however, the *Wagner* district court went on to analyze the case in terms of the three-part test articulated in *Union Texas Petroleum Corp. v. PLT Engineering*, 895 F.2d 1043 (5th Cir.), *cert. denied*, 498 U.S. 848, 111

*Ocean Drilling & Exploration Co.*, 923 F.2d 393 (5th Cir.1991), *cert. denied*, 502 U.S. 1033, 112 S.Ct. 874, 116 L.Ed.2d 779 (1992); *Lewis v.*

S.Ct. 136, 112 L.Ed.2d 103 (1990). The court noted that in *Hollier v. Union Texas Petroleum Corp.*, 972 F.2d 662, 665 (5th Cir.1992), also an indemnity case, we decided the situs aspect of the *PLT* test in stating that the injured worker "was in physical contact with the platform at the time of his injury." The *Wagner* district court noted that strict conformity with this phrase in *Hollier* would mandate a holding that the case did not arise on an OCSLA situs. The court then reasoned that, under *PLT*, the situs requirement in a *contractual* dispute "could be met when '[t]he locations where the substantial work pursuant to the contract was done were covered situses.'" 899 F.Supp. at 1556 (quoting 895 F.2d at 1047) (alteration added). The court stated that under *PLT*, the situs requirement was met in the instant case because the "work required by the contract was performed on an offshore platform." 899 F.Supp. at 1556. No discussion accompanied this statement; the justification for this conclusion was self-evident in the court's earlier application of the *Davis & Sons* factors. Having noted the conflict between *Union Texas* and *Hollier*, the *Wagner* district court returned to the proposition it had previously labeled arguable, namely, that under *Domingue* Louisiana law would apply regardless of situs because the relevant contract was non-maritime. The *Wagner* court disposed of the second prong of the *PLT* test with the following two sentences: "The second factor under the [*PLT*] analysis is met because federal maritime law does not apply to *the issue* at hand, i.e., the indemnity claims under a contract entered into between the parties. In particular, the contract is non-maritime." 899 F.Supp. at 1556 (emphasis in original).

The confusion inherent in our case law is evident from the *Wagner* district court's heroic efforts to deal with the conflicting precedent.

As we will explain, we believe the court's focus on the *Davis & Sons* factors eliminates at least one area of concern, namely, the difference between deciding whether a con-

*Glendel Drilling Co.*, 898 F.2d 1083, 1084, 1087– 1088 (5th Cir.1990), *cert. denied*, 502 U.S. 857, 112 S.Ct. 171, 116 L.Ed.2d 134 (1991).

tract is maritime and whether maritime law applies of its own force. These two inquiries are identical in the context of oilfield indemnity disputes in the OCSLA context, and both belong as a single factor in the three part *PLT* test. We employ this three part test to resolve this case. We affirm the district court's conclusion that the OCSLA's assimilation of state law applies to this case.

a

We first address the elements of the test governing whether the OCSLA applies. In particular, we discuss the relationship between the three-part test of *Union Texas Petroleum Corp. v. PLT Engineering*, 895 F.2d 1043 (5th Cir.), *cert. denied*, 498 U.S. 848, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990), and the apparent short-circuit of these factors in *Domingue v. Ocean Drilling & Exploration Co.*, 923 F.2d 393 (5th Cir.1991), *cert. denied*, 502 U.S. 1033, 112 S.Ct. 874, 116 L.Ed.2d 779 (1992).

The *PLT* test was first announced in that case in 1990 without relevant citation. The test consists of three factors: "(1) The controversy must arise on a situs covered by OCSLA (i.e. the subsoil, seabed, or artificial structures permanently or temporarily attached thereto). (2) Federal maritime law must not apply of its own force. (3) The state law must not be inconsistent with Federal law." 895 F.2d at 1047. Since then, this court has implicitly recognized the viability of this test by employing it on several occasions. *See, e.g., Smith v. Penrod Drilling Corp.*, 960 F.2d 456, 459 (5th Cir.1992); *Hollier v. Union Texas Petroleum Corp.*, 972 F.2d 662, 664 (5th Cir.1992).

In *Domingue*, however, we appeared to short-circuit this test entirely. *Domingue* concerned a jack-up drilling rig owner's reliance on an indemnity clause in a master agreement in response to a suit by a well-tester who was injured aboard the rig, at the time located on the Outer Continental Shelf.[9] To decide the case, the court relied exclusively upon its conclusion, reached after an application of the six-factor test of *Davis & Sons,*

*Inc. v. Gulf Oil Corp.*, 919 F.2d 313 (5th Cir.1990), that the contract was non-maritime. The opinion does not mention the OCSLA, despite the fact that the rig was jacked up on the Outer Continental Shelf and all of the activity and contractual relationships of the parties concerned the drilling operations conducted there. Although noting early in the opinion that our cases had consistently categorized jack-up rigs as vessels, 923 F.2d at 394 & n. 1, the court only mentioned "situs" twice, and on both occasions asserted the irrelevance of the place of the performance of a particular service to the determination of whether the underlying contract is maritime. *See id.* at 396 ("[T]he situs of performance of a wireline operation does not definitively categorize it."); *id.* at 397 (referring to "the universally rejected contention of situs"). The *Domingue* court concluded: "[W]e hold that ... the service contract is therefore non-maritime. Accordingly, LOIA controls to invalidate the indemnity provision of the blanket contract." 923 F.2d at 398.

The absence of any mention of the OCSLA, situs, and consistency with federal law led the district courts in this case and in *Wagner v. McDermott, Inc.*, 899 F.Supp. 1551 (W.D.La.1994), *aff'd*, 79 F.3d 20 (5th Cir.1996), to suggest that perhaps the only inquiry relevant to the choice of law in matters arising out of oil exploration activities on the Outer Continental Shelf was the status of the contract as maritime or non-maritime. In essence, these lower court decisions suggested that if the contract was non-maritime, state law applied of its own force. *See Wagner v. McDermott, Inc.*, 79 F.3d 20, 22 (5th Cir.1996) ("If the OCSLA does not apply, Louisiana law governs the dispute.") (citing *Domingue* ). In light of *Domingue*, these suggestions were understandable. The difficulty is that the OCSLA itself asserts federal dominion over the Outer Continental Shelf and artificial islands fixed thereto. In addition, the extension of state law qua state law would remove an important limit on the OCSLA's assimilation of state law, namely,

---

9. A factual twist in *Domingue* made the case somewhat complex: the injured worker was not employed by the company against whom the rig

owner sought indemnity, and his work order did not arise from the master contract containing the indemnity clause. 923 F.2d at 394.

that the state law be not inconsistent with federal law. When federal law assimilates state law, it normally assimilates only that portion of state law consistent with federal policy; when state law applies of its own force, federal law displaces state law only in the presence of an overwhelming federal interest, despite the existence of an arguably inconsistent federal policy. *See* Paul J. Mishkin, *The Variousness of "Federal Law,"* 105 U.Pa.L.Rev. 797 (1957). As the Supreme Court made clear in *Rodrigue v. Aetna Casualty Surety Co.,* 395 U.S. 352, 355–56, 89 S.Ct. 1835, 1836–37, 23 L.Ed.2d 360 (1969), "The purpose of the Lands Act was to define a body of law applicable to the seabed, the subsoil, and the fixed structures ... on the outer Continental Shelf. That this law was to be federal law of the United States, applying state law only as federal law and then only when not inconsistent with applicable federal law, is made clear by the language of the Act." *See also id.* at 357, 89 S.Ct. at 1837–38 ("It is evident from this that federal law is 'exclusive' in its regulation of this area, and that state law is adopted only as surrogate federal law."). To the extent that the OCSLA does not govern because a controversy arises in a particular maritime setting and bears a nexus to traditional maritime functions, maritime law controls. *See Mills v. Director,* 877 F.2d 356 (5th Cir.1989) (en banc) (noting that Congress enacted the OCSLA to fill the gap caused by the fact that the Outer Continental Shelf "lies beyond state boundaries").[10]

In arriving at this reading of *Domingue,* we draw significant support from the statements in our prior cases suggesting that the questions of whether a contract is maritime, step one in the test articulated by the district court in this case, and of whether federal maritime law applies of its own force, factor two in the *PLT* three-factor test, are one and the same thing in the context of an oilfield indemnity agreement. *See Wagner,* 79 F.3d at 22 ("Since the contract is non-maritime, maritime law does not apply."); *Hollier v. Union Texas Petroleum Corp.,* 972 F.2d 662,

665 (5th Cir.1992). In addition, we note that our more recent cases omit altogether a discussion of a separate inquiry as to whether a contract is maritime or non-maritime in favor of a focus on the *PLT* three-part test. *See, e.g., Dupre v. Penrod Drilling Corp.,* 993 F.2d 474, 476 (5th Cir.1993); *Smith v. Penrod Drilling Corp.,* 960 F.2d 456, 459 (5th Cir.1992). This omission suggests that the *PLT* test has supplanted, not complemented, the two-step inquiry applied by the district court in this case and arguably suggested by the narrow focus of the *Domingue* court.

It is not clear whether in *Domingue* the first and third elements were at issue. It is not clear whether *Domingue* applied, sub silentio, the three-part *PLT* test, but addressed only the question of whether maritime law applied of its own force, an inquiry identical to whether a contract is maritime or non-maritime. We decline to read into that case an odd proposition it did not state, namely, that a finding that a contract is non-maritime compels the conclusion that state law applies of its own force in the context of oil operations conducted on the Outer Continental Shelf.

■ The proper test for deciding whether state law provides the rule of decision in an OCSLA case remains the three-part *PLT* test.

b

The PLT test consists of three factors: "(1) The controversy must arise on a situs covered by OCSLA (i.e. the subsoil, seabed, or artificial structures permanently or temporarily attached thereto). (2) Federal maritime law must not apply of its own force. (3) The state law must not be inconsistent with Federal law." *Union Texas Petroleum Corp. v. PLT Engineering,* 895 F.2d 1043, 1047 (5th Cir.), *cert. denied,* 498 U.S. 848, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990). We address each element in turn.

---

**10.** In adopting this interpretation, we of necessity construe the reference to "federal law" in the opening sentence of Part II of *Rodrigue, see* 395 U.S. at 352, 89 S.Ct. at 1835, as referring to federal maritime law, or more specifically, the Death on the High Seas Act, 46 U.S.C. §§ 761–768.

i

■ Forest, A & A, and their insurers concentrate the brunt of their attack on the district court's finding that the situs factor was satisfied. In particular, appellants in this portion of the case argue that *Hollier v. Union Texas Petroleum Corp.*, 972 F.2d 662, 665 (5th Cir.1992) and *Smith v. Penrod Drilling Corp.*, 960 F.2d 456, 459 (5th Cir.1992), established the rule that the situs of the controversy in an OCSLA indemnity clause case is the location of the underlying accident. The appellants emphasize the language in *Hollier* that the OCSLA situs requirement was met in that case because the injured worker "was in physical contact with the platform at the time of his injury." 972 F.2d at 665. They then argue that this accident occurred on the MISS DEBORAH, a ship, and thus that the situs requirement is not met here.

Assuming without deciding that *Hollier* and *Smith* state a rule in this circuit providing that the situs of the controversy in an OCSLA indemnity clause case is the location of the accident, we agree with the district court and find that the situs requirement is met in this case. Hodgen was in physical contact with the rope, a portion of the platform, at the time of his unfortunate landing on the MISS DEBORAH. *Hollier* itself established that when an injured worker is in contact with both a platform and a boat, the first factor of the *PLT* test is satisfied, for in that case, the worker was injured when "[o]ne day, as he was crossing from the boat to the platform, he slipped between the boat and the platform, was crushed, and then drowned." 972 F.2d at 664. In applying the OCSLA to legal controversies arising out of injuries in which the worker was in contact with both a platform and a vessel, the *Hollier* court followed the Supreme Court's holding in the first of the twin cases in *Rodrigue v. Aetna Casualty Co.*, 395 U.S. 352, 353, 89 S.Ct. 1835, 1835–36, 23 L.Ed.2d 360 (1969). In that case, the Court applied the OCSLA's assimilation of state law to a case in which a worker operating a crane was killed when the crane toppled over onto a barge moored adjacent to the platform.

Forest argues that the evidence shows that Hodgen suffered his injuries not when the MISS DEBORAH first came up under his feet, but a split second later when the impact of this initial contact knocked Hodgen on all fours, and that Hodgen at this later moment had released the rope. The district court made no findings of fact on this issue, and the evidence is equivocal. Randy Ardoin testified to two or three different versions of the events of the accident, but one of these versions suggested that Hodgen maintained his hold on the rope as he was knocked on all fours. In addition, one physician testified that Hodgen's injuries could have been caused by either the initial or the subsequent impact with the MISS DEBORAH, or by both.

Even if the evidence were pellucid that Hodgen's injuries were caused by the spill onto all fours, and that Hodgen released the rope at this precise moment, we would still find OCSLA situs present. In *Hollier*, the injured worker "was crushed, then drowned." 972 F.2d at 664. Unless we are to believe that the *Hollier* plaintiff sank immediately to the seabed or drowned while at all times remaining in contact with the platform, we must presume that the drowning did not occur while the worker was in physical contact with an OCSLA situs. Thus, the *Hollier* court's holding would compel the conclusion that this circuit does not apply any physical contact rule with the rigidity that appellants would impose. Assuming that *Hollier* properly states the rule for the situs requirement in contractual cases, *but see Union Texas Petroleum v. PLT Engineering*, 895 F.2d 1043 (5th Cir.1990), *cert. denied*, 498 U.S. 848, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990), we find an OCSLA situs present in this case.

ii

■ We agree with the district court that the contract between Forest and OCS was non-maritime. In *Davis & Sons, Inc. v. Gulf Oil Corp.*, 919 F.2d 313 (5th Cir.1990), we articulated six questions relevant to this inquiry:

1) what does the specific work order in effect at the time of injury provide? 2) what did the crew assigned under the work

order actually do? 3) was the crew assigned to work aboard a vessel in navigable waters[?] 4) to what extent did the work being done relate to the mission of that vessel? 5) what was the principal work of the injured worker? and 6) what work was the injured worker actually doing at the time of injury?

919 F.2d at 316 (emphasis added). *Davis & Sons* also made clear that the relevant contract is any master agreement as modified by the specific work order in effect at the particular time and by the practice of the parties to the contract. 919 F.2d at 316–17; *see also Lefler v. Atlantic Richfield Co.*, 785 F.2d 1341, 1343 (5th Cir.1986) (focusing on the contract as modified by the parties' practice). The court below found that all six questions yielded an answer suggesting that the contract was non-maritime. We find no error.

■ Although there was no written work order in effect at the time of Hodgen's injury, the district court found that "all work performed for Forest by OCS's personnel was related exclusively to Forest's fixed platforms." *Hodgen v. Forest Oil Corp.*, 862 F.Supp. 1560, 1564 (W.D.La.1994). OCS personnel performed no work aboard the MISS DEBORAH or any other vessel. The platform-related work was incidental to the mission of the MISS DEBORAH; OCS did not have to provide or use a vessel to comply with its contractual obligations, and OCS personnel were often taken to various platforms in the 255 group by helicopter. Hodgen's work was the operation and maintenance of Forest's fixed platforms, and he was engaged in this work at the time of his injury. All six *Davis & Sons* factors suggest that the contract was non-maritime.

Forest, A & A, and their insurers dispute this reasoning on two grounds. First, they argue that Hodgen was engaged in the process of moving from the platform to the MISS DEBORAH at the time of the accident; the argument runs that ingress and egress to the vessel is a separable maritime obligation within a non-maritime contract. Circuit precedent forecloses this argument. *Hollier v. Union Texas Petroleum Corp.*, 972 F.2d 662, 665 (5th Cir.1992) (refusing to label "the act of stepping from the crew boat to the platform" as a "separable maritime obligation in a contract to perform services on a platform"). Second, appellants contend that Hodgen "worked" as he was traveling from platform to platform because the nature of his responsibilities made such travel necessary. Under appellants' analysis, few if any contracts concerning the exploitation of resources on the Outer Continental Shelf would be non-maritime because the location of these resources necessitates significant travel over water. The very existence of the OCS-LA's assimilation of state law suggest that this result is incorrect. Unless the mission of the injured worker and his compatriots bears a more significant relationship to the mission of the vessel, *cf. Campbell v. Sonat Offshore Drilling, Inc.*, 979 F.2d 1115, 1123–24 (5th Cir.1992), this type of "work" is simply not the stuff of the *Davis & Sons* inquiry, and none of our cases have so held. *See Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1231 (5th Cir.1985) ("While the contract no doubt contemplated the hiring of vessels and seamen to build the structure, the subject matter of this case has no direct relationship with these traditional subjects of maritime law").

### iii

We find nothing in the LOIA inconsistent with federal law. Although we have traveled this ground before, *see Knapp v. Chevron USA, Inc.*, 781 F.2d 1123, 1130–31 (5th Cir.1986), A & A makes a complex argument that in essence asks us to apply the holding of *Voisin v. O.D.E.C.O. Drilling Co.*, 744 F.2d 1174 (5th Cir.1984), *cert. denied*, 470 U.S. 1053, 105 S.Ct. 1757, 84 L.Ed.2d 820 (1985), and allow the Forest Group coverage as additional insured in OCS's insurance policies or, in the alternative, a breach of contract action against OCS for failure to name the Forest Group as additional insureds. We decline this invitation to revisit precedent. The OCSLA incorporates state law. State law in this case does not provide for the *Voisin* escape route around its prohibition of the enforcement of indemnity agreements. *See Marcel v. Placid Oil Co.*, 11 F.3d 563, 569 (5th Cir.1994) (The LOIA voids " 'waivers of subrogation, additional named insured endorsements, or any other form of insurance

protection which would frustrate or circumvent'" the Act's protections.) (quoting La. Rev.Stat. § 9:2780.G). We decline to revisit the holding of *Knapp*.

2

The LOIA voids indemnity agreements purporting to provide "for defense or indemnity, or either, to the indemnitee against loss or liability for damages arising out of or resulting from death or bodily injury to persons, which is caused by or results from the sole or concurrent negligence or fault (strict liability) of the indemnitee." La.Rev.Stat. § 9:2780.B. Additional insured and other contractual arrangements designed to circumvent this prohibition are also unenforceable. La.Rev.Stat. § 9:2780.G.

Seeking to escape the LOIA's mandate, Forest, A & A, and their insurers argue that the exception to the LOIA recognized in *Marcel v. Placid Oil Co.*, 11 F.3d 563 (5th Cir.1994), allows enforcement of the indemnity agreement in this case. In addition, Forest in its capacity as platform owner argues that the district court's finding of no platform fault should entitle it to recover its defense costs under *Meloy v. Conoco, Inc.*, 504 So.2d 833 (La.1987). We hold that *Marcel* itself forecloses the appellants' first argument. Finding no guidance in state or federal case law on the *Meloy* argument, we certify this matter, along with the insurance questions, to the Louisiana Supreme Court.

a

■ In *Marcel*, this court recognized that "[t]he LOIA is aimed at preventing the shifting of the economic burden of insurance coverage or liability onto an independent contractor." 11 F.3d at 569. Accordingly, we recognized an exception to the LOIA when an indemnitor purchases insurance for both itself and the indemnitee, and the indemnitee reimburses the indemnitor for the portion of the premium corresponding to the cost of covering the indemnitee. We reasoned that "[i]f the principal pays for its own liability coverage ... no shifting occurs." *Id.*

■ Appellants assert that this case falls within the *Marcel* exception for two reasons.

First, OCS's premiums did not vary according to the identity of the parties named as additional insureds. Second, Forest had a "working policy" allowing contractors like OCS to factor the cost of naming the Forest Group as insureds into the price they charged Forest.

We find neither argument convincing. The *Marcel* court stressed that the exception it recognized "does not apply if any material part of the cost of insuring the indemnitee is borne by the independent contractor procuring the insurance coverage." *Id.* at 570. In this case, OCS payed all of the premiums in full. Accepting Forest's argument that OCS could raise its price according to the amount necessary to cover its insurance ·costs would gut the LOIA, since all contractors will take this economically necessary step. The fact that the premiums did not vary according to the identity of the additional insured does not change the fact that these premiums were paid, and that OCS paid them.

b

In accordance with Rule XII § 3 of the Supreme Court of Louisiana, we provide the following statement identifying the "nature of the cause and circumstances out of which the question of law arises." *Meloy v. Conoco, Inc.*, 504 So.2d 833, 835 (La.1987). Our desire to make the Rule XII statement complete necessitates some repetition.

Platform worker Jerry Hodgen was employed by Operators & Consulting Services, Inc. OCS entered into a Master Service Agreement with platform owner Forest Oil Corp. To assist in its operations, Forest time chartered the M/V MISS DEBORAH. Hodgen suffered injuries in the scope of his employment for OCS while assigned to work on one of Forest's fixed platforms located on the Outer Continental Shelf. Hodgen sued Forest and the MISS DEBORAH. The district court found that Hodgen's injuries were caused by the joint negligence of the MISS DEBORAH and Forest in its capacity as the vessel's time charterer. The district court exonerated Forest in its capacity as platform owner of all negligence. On appeal, we affirmed the district court's findings of fault in toto.

Seeking to shift the costs of litigation and its own negligence to a third party, Forest filed a third-party complaint against OCS and a group of Five Underwriters. This suit sought to invoke a broad indemnity clause in the Master Service Agreement between OCS and Forest requiring OCS and the Five Underwriters to defend Forest and hold it harmless for any suit by an OCS employee arising out of the contractual activity.[11] The district court held that the assimilation of state law in the Outer Continental Shelf Lands Act, 43 U.S.C. § 1333(a)(2)(A), made the Louisiana Oilfield Indemnity Act, La. Rev.Stat. § 2780, applicable to the lawsuit. On appeal, we affirmed the district court's holding that the LOIA governs the validity of the indemnity clause in this case, and thus we have held that Forest may not shift its share of the damages suffered by Hodgen, or the costs of defending itself in its role as time charterer, to OCS.

Forest argued below that because it was exonerated of any negligence in its capacity as platform owner, the doctrine of *Meloy v. Conoco, Inc.*, 504 So.2d 833, 839 (La.1987), should allow it to collect the costs of defending itself in that capacity. In *Meloy*, the Louisiana Supreme Court held that the LOIA does not prevent enforcement of an indemnity clause to the extent that a indemnitee seeks to recover its defense costs when it is "not negligent or at fault." The district court rejected Forest's *Meloy* argument. Filing a separate brief in its capacity as platform owner, Forest appeals.

The facts of *Meloy* did not require the court to address a situation in which an indemnitee is found faultless in one capacity but culpable in another. Although some of our case law, most recently *Wagner v. McDermott, Inc.*, 79 F.3d 20 (5th Cir.1996), treats a single party acting in its capacities

as time charterer and platform owner as two distinct entities, it is unclear whether state law would extend this treatment to the *Meloy* context. To resolve this question, we certify Question 1, the text of which appears at the end of this opinion, to the Louisiana Supreme Court.[12]

### III

The remaining issues in this case concern the dispute between Forest and the insurers of A & A regarding who must pay for Forest's liability in its capacity as a time charterer. These matters in particular may concern the operation of "other insurance" clauses in the insurance contracts covering A & A as well as those allegedly covering Forest. The issues raised in this case turn on important policies of state law. Accordingly, we certify these matters to the Louisiana Supreme Court. We begin our discussion with a complete "statement of facts showing the nature of the cause and the circumstances out of which the question of law arises." *Meloy v. Conoco, Inc.*, 504 So.2d 833, 835 (La.1987). We also decide certain issues necessary to reduce this portion of the case to three certifiable questions. We acknowledge that certain of these resolutions will be dicta if the Louisiana Supreme Court answers Certified Question Two affirmatively. *See Deshotels v. SHRM Catering Services, Inc.*, 842 F.2d 116, 119 (5th Cir.1988). We conclude with a brief explanation of our certified questions.

### A

Platform worker Jerry Hodgen was employed by Operators & Consulting Services, Inc. OCS entered into a Master Service Agreement with platform owner Forest Oil Corp. To assist in its operations, Forest time chartered the M/V MISS DEBORAH in

---

**11.** Forest also sued Aetna Casualty & Surety Co., one of OCS's insurers, alleging that OCS had in fact named Forest as an additional insured in OCS's policy with Aetna. The district court held that Forest was not an additional insured on the Aetna policy. Although Forest did appeal certain rulings the district court made in conjunction with its discussion of matters pertaining to Aetna, Forest has not appealed the holding that

Forest was not an additional assured on the Aetna policy.

**12.** Should the Louisiana Supreme Court answer this question affirmatively, we would follow *Meloy* and remand this case to the district court for a calculation of those expenses attending the defense of Forest only in its capacity as platform owner, as well as a decision as to whether OCS or the Five Underwriters must bear this cost.

a non-demise fashion from the vessel's owners and operators, A & A Boats, Inc. and C & G Marine, Inc. (collectively "A & A"). The time charter required A & A to procure insurance in favor of Forest. The charter itself contained no provision specifying whether the insurance procured by A & A would be primary or secondary to any other applicable insurance.

In accordance with its obligations under the Blanket Time Charter, A & A bought Protection and Indemnity insurance policies from Commercial Union Insurance Co. and Albany Insurance Co. The Commercial Union policy provided primary coverage and has policy limits of $500,000. It named Forest as an additional insured. It also included the following language under the heading "OTHER INSURANCE": "Provided that where the Assured is, irrespective of this insurance, covered or protected against any loss or claim which would otherwise have been paid by the Underwriters under this Policy, there shall be no contribution or participation by the Underwriters on the basis of excess, contributing, deficiency, concurrent, or double insurance or otherwise." Those in the insurance industry refer to this type of other insurance clause as an escape clause. The Albany policy provided coverage excess to that of the Commercial Union policy and limited Albany's liability to $4,500,000. Section 2(a) of the Albany policy limited Albany's responsibilities to "liability, loss, damage, or expense insured against under the" Commercial Union policy. Thus, the Albany policy incorporated the Commercial Union escape clause.

The Commercial Union policy included certain further language that may be relevant to this litigation. Under the heading "LIMIT OF LIABILITY," the policy provided, "Liability hereunder [illegible] consequences of any one casualty or occurrence, including defense costs, shall not exceed the sum of $500,000 less any applicable deductible, regardless of how many separate injuries or claims arise out of such casualty or occurrence."

In addition, Forest purchased certain insurance. As we will explain, we are uncertain whether Louisiana law renders irrelevant the insurance Forest purchased on its own. We describe these policies only to comply with our obligations under Rule XII in the event that the Louisiana Supreme Court decides that their terms are relevant to its disposition of this case.

Forest bought a Workers Compensation and Employers Liability Insurance policy from the Insurance Company of North America. The INA policy covered Forest for its employees' "bodily injur[ies arising] out of and in the course of the injured employee's employment by [Forest]" to policy limits of $1,000,000. Under the heading "Other Insurance," the INA policy provided as follows:

We will not pay more than our share of damages and costs covered by this insurance and other or self-insurance. Subject to any limits of liability that apply, all shares will be equal until the loss is paid. If any insurance or self-insurance is exhausted, the shares of all remaining insurance and self-insurance will be equal until the loss is paid.

The parties inform us that, despite the reference to "equal shares" in the above language, this type other insurance clause is called a pro-rata clause. The phrase "pro-rata" refers to a system of assigning responsibility for satisfaction of the claim by requiring each insurer with an applicable policy to pay in accordance with the fraction generated by the division of that insurer's policy limits with the sum of the limits of all applicable policies.

In addition, Forest purchased a broad umbrella policy providing various types of coverage from a conglomeration of various underwriters; the parties refer to this policy as the "Storebrand" policy. All agree that the Storebrand policy provided coverage excess to that provided by the INA policy to a limit of $50,000,000. The parties dispute whether the Storebrand policy also provides primary coverage to Forest in its capacity as time charterer with policy limits of $50,000,000, although, as we will explain, we find ourselves able to resolve this dispute without the aid of the Louisiana Supreme Court. Section vii, part L of the Storebrand policy specified under the heading "OTHER INSURANCE,"

If other valid and collectible insurance with any other insurer is available to the Assured covering a loss also covered by this Cover Note, other than insurance that is specifically stated to be excess of this Cover Note, the insurance afforded by this Cover Note shall be in excess of and shall not contribute with such other insurance.

The insurance industry labels this type of other insurance clause an excess clause.

Hodgen suffered injuries in the scope of his employment. These injuries were caused by the joint negligence of A & A and of Forest in its capacity as the MISS DEBORAH'S time charterer. Hodgen sued A & A and Forest and recovered $2,402,990.19 plus interest in federal district court. The district court assigned 85% of the fault to Forest in its capacity as time charterer. On appeal, we have affirmed. The district court held that at the time of the accident, Hodgen was a borrowed employee of Forest within the meaning of *Doucet v. Gulf Oil Corp.*, 783 F.2d 518, 522–23 (5th Cir.), *cert. denied*, 479 U.S. 883, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986). No party has appealed that ruling. The district court also held that neither Forest nor A & A was entitled to limit its liability to the value of the MISS DEBORAH and her cargo under 46 U.S.C. § 183(a). Although the parties have engaged in a dispute as to who bore the burden of appealing this ruling, a dispute we do not reach, no party has in fact appealed this portion of the district court's decision.[13]

Forest filed a third party complaint against Commercial Union and Albany seeking reimbursement for its damages and expenses under the policies issued by those two entities. Commercial Union and Albany admit that, but for the escape clauses in their policies and the existence of the INA and Storebrand policies, they would be liable to Forest. No party has joined INA or Storeb-

rand to this litigation. The parties agree that Louisiana law governs their dispute.[14]

### B

We detail here our resolutions to questions that we decline to certify to the Louisiana Supreme Court.

We first consider an argument from Commercial Union. We have granted the limit of liability section of the Commercial Union. This language limited Commercial Union's liability to $500,000. Commercial Union has paid this sum in full to A & A as partial reimbursement for litigation costs and the 15% share of A & A's liability. Albany has reimbursed A & A for the remainder of these expenses. Commercial Union asks us to affirm the judgment below in its favor on the ground that it has exhausted its policy limits. Forest offers two arguments against Commercial Union's request for an affirmance on this alternative ground. Forest's primary contention is that because the Commercial Union policy did not define "accident or occurrence," we must hold that Hodgen's injuries constituted two separate accidents under *Nora v. Grayline Motor Tours, Inc.*, 499 So.2d 401 (La.App.1986). We have little difficulty in rejecting this argument. As Forest recognizes, *Nora* involved two overturned buses, with each mishap caused by the independent negligence of a separate driver. In this case, only one injured worker was injured once. To our eyes, and we think the eyes of the Louisiana Supreme Court, the policy language will not support the effort to transform Hodgen's injury into two separate accidents or occurrences. Commercial Union cannot be made to pay more than $500,000 in this litigation.

Forest's secondary contention is that Commercial Union's duty to defend Forest arose simultaneously with its duty to defend A &

---

**13.** Forest also initially filed a breach of contract suit against A & A in some manner related to the Section 183(a) issue. The district court dismissed this suit. No party has appealed that dismissal.

**14.** State law applies either because of the OCS-LA's assimilation of state law or because federal maritime law looks to the rules of the state having the greatest interest in the resolution of

the issues to decide maritime insurance questions in the absence of a "specific and controlling federal rule." *Truehart v. Blandon*, 884 F.2d 223, 226 (5th Cir.1989). Because the parties have agreed that Louisiana law governs their dispute, we do not decide what rationale better undergirds our decision to ask the Supreme Court of Louisiana for assistance.

A, and that both duties arose before Commercial Union's obligation to indemnify A & A and Forest for Hodgen's damages. Accordingly, Forest argues that Commercial Union's first obligation was to provide a defense for both Forest and A & A, and that only when the costs of defense were fully calculated should Commercial Union have paid any portion of A & A's substantive liability. We agree with Forest in part. If in fact Commercial Union owed a duty to Forest to provide coverage, in addition to its duty to defend and indemnify A & A, the fact that Commercial Union has already paid $500,000 to A & A would not be a complete defense to Forest's third party complaint. We find it unlikely that the Louisiana Supreme Court would hold that an insurer who owes a simultaneous duty to two individual insureds arising out of the same accident and the same policy may pick one insured to favor and disregard the other entirely. Commercial Union's obligation would be, at minimum, to provide a defense to both of its insureds, and then to pay the damages imposed upon both until its policy limits were exhausted. The parties have not addressed, however, how under Louisiana law an insurer is to apportion the sum of money representing its policy limits when the defense and indemnity costs of two separate insureds exceed these limits, and we include this issue in our certified questions.[15]

Second, we address Forest's argument that parole evidence is relevant to decide whether Forest and A & A intended for any insurance bought by A & A and naming Forest as an additional insured to be primary to insurance bought by Forest on its own behalf. We do not agree. We find no ambiguity in the Blanket Time Charter, which includes an integration clause, or in the relevant insurance policies that would warrant a resort to parole evidence. *See Diefenthal v. Longue Vue Management Corp.*, 561 So.2d 44, 51 (La.1990). The absence of any language in the Charter on this matter makes clear that the parties did not contemplate overlapping insurance and simply had no intent on the matter. Moreover, each individual insurance policy is, perhaps unfortunately, extremely clear as to its provisions in the event of other insurance. Accordingly, we will decide this matter in the same manner as we would a normal overlapping insurance case, that is, by reference to the effect that state law gives to the other insurance clauses. We hold that the Louisiana parole evidence rule does not allow consideration of parole evidence.

Third, we address Forest's argument that the Storebrand policy provided only secondary coverage for Forest's liability in this case. We cannot agree. Section vii of this policy consisted in part of the form "Umbrella Policy (London 1971)," Part II of which provided that the Storebrand's policy coverage was limited to the loss in excess of the coverage provided by the INA policy. Section vii of the Storebrand policy, however, included a series of eight endorsements. Endorsement No. 1, Paragraph 14, under the heading "UNCOVERED BY UNDERLYING INSURANCE," excluded all coverage for "any liability whatsoever not covered by the underlying insurances as set out in the attached schedule" except in the amount of loss covered by the primary policy but above the primary policy's limits. Endorsement No. 8 provided that "it is understood and agreed that notwithstanding of Paragraph 14, *UNCOVERED BY UNDERLYING INSURANCE*, contained in Section (vii), Endorsement No. 1, this insurance will respond excess of a self-insured retention of U.S. $25,000 each and every loss in respect of Charterer's Legal Liability" (emphasis in original). We are confident of the view of the Louisiana Supreme Court on this issue. The language of this last endorsement is plain. In the event that resolution of this question becomes necessary, we hold that the Storebrand Policy provided primary insurance for this loss to policy limits of $50,000,-000.

## C

We provide here a brief explanation of the three insurance questions certified to the

---

**15.** The Louisiana Supreme Court may choose to invoke its authority under Rule XII to request further briefing on this matter.

Louisiana Supreme Court. An answer to Certified Question Three may be unnecessary, depending on the answer to Certified Question Two.

### 1

Initially, the resolution of this case depends upon whether the failure of Commercial Union and Albany to join INA and Storebrand precludes the former duo from relying on the possibility of other coverage from other insurers to escape or reduce their liability. At least one case from the Louisiana Court of Appeal suggests that an insurer who has issued a policy covering a particular loss may not invoke an other insurance clause to escape or reduce liability to the insured without joining the other insurers allegedly providing coverage in the same litigation. *Wilks v. Allstate Insurance Co.*, 195 So.2d 390 (La.Ct.App.1967). The *Wilks* rule responds to the possibility of gaps in coverage opened by inconsistent verdicts and attempts to preserve the benefit of an insurer's obligation to defend the insured from suit. Nevertheless, *Wilks* may also depend on the availability under Louisiana substantive law of an action in indemnity or subrogation by one insurer against another. Cases from the Louisiana Court of Appeal decided before and after *Wilks* test the vitality of *Wilks*. *Tufaro v. Stanley Bishop Real Estate, Inc.*, 422 So.2d 220 (La.Ct.App.1982); *Fasullo v. American Druggists' Insurance Co.*, 262 So.2d 810 (La.Ct.App.), *writ denied*, 262 La. 1089, 266 So.2d 220, (1972); *Fremin v. Collins*, 194 So.2d 470 (La.Ct.App.1967). *But see Berninger v. Georgia–Pacific Corp.*, 582 So.2d 266 (La.Ct.App.1991). In the face of this case law, we are uncertain whether Louisiana law allows Commercial Union and Albany to escape or reduce their liability to Forest because Forest may enjoy coverage from other, nonparty insurers. We certify Question Two to the Louisiana Supreme Court. Its text is at the end of this opinion.

If the Louisiana Supreme Court answers Certified Question Two affirmatively, Commercial Union and Albany will be responsible for the entirety of the defense and indemnity costs of both A & A and Forest. Because some liability has been imposed upon Commercial Union for Forest's loss, however, a question remains as to how to apportion the $500,000 that Commercial Union owes to both Forest and A & A between the two. The limits of the two policies cover this loss entirely, and an affirmative answer to Certified Question Two would impose such an obligation on both insurers, requiring Albany to pay all losses over $500,000. Nevertheless, we have included Certified Question Two–A, in order to resolve the issue of to whom Commercial Union must pay its $500,000 should the Supreme Court of Louisiana conclude that *Wilks* states the present law of Louisiana.

### 2

In the event that the Supreme Court of Louisiana holds that Louisiana law allows consideration of other insurance with joinder of the other insurers, a question remains as to which insurers must respond for what losses. Although we recognize that, absent reliance in subsequent litigation on the rules of privity, any ruling we issue in this case will bind only Commercial Union, a negative answer to Question Two necessitates the calculation of the liability of Commercial Union with an eye to what INA and the Storebrand group might pay.[16]

Resolution of this dispute depends on the relationship among the INA, Storebrand, and Commercial Union policies. Given a negative answer to Certified Question Two, Albany's excess policy would no longer be directly at issue because of the doctrine of *Truehart v. Blandon*, 884 F.2d 223 (5th Cir.1989). Under *Truehart*, in a case in which an insured enjoys some excess insurance as well as overlapping layers of primary insurance, liability will not attach to the excess insurer until the limits of all primary policies have been exhausted. *See Penton v. Hotho*, 601 So.2d

---

**16.** An answer to this question may also affect Albany's duties to A & A, since Albany must respond to A & A for all costs associated with A & A's defense and indemnity not subsumed with Commercial Union's $500,000 payment to A & A and Forest.

762, 764–65 (La.Ct.App.1992). In this case, the INA, Commercial Union, and Storebrand policies all provided primary coverage to Forest. Because the limits of these three policies total $51,500,000, more than enough to cover Forest's losses in this case, Forest need not look to Albany's true excess policy.

This case is a battle of the other insurance clauses in the three policies. Our review of Louisiana cases leaves us uncertain as to how Louisiana would distribute liability among three such insurers. There are three potential conflicts in the other insurance clauses: escape versus excess, escape versus pro-rata, and excess versus pro-rata. All three are here possible, since the Commercial Union policy includes an escape clause, the INA policy a pro-rata clause, and the Storebrand policy an excess clause.

Regarding the first conflict, in *Graves v. Traders & General Insurance Co.*, 252 La. 709, 214 So.2d 116 (1968), the Louisiana Supreme Court held escape and excess clauses mutually repugnant and apportioned liability pro-rata according to policy limits. *Accord Sledge v. Louisiana Department of Transportation and Development*, 492 So.2d 139, 144–45 (La.Ct.App.) (citing cases), *writ denied*, 494 So.2d 1176 (1986). *But see Lodrigue v. Montegut Auto Marine Service*, 1978 A.M.C. 2272 (E.D.La.1977) (adopting a contrary rule in an opinion that does not specify whether the court was applying Louisiana law). We note, however, that at least one intermediate appellate court has interpreted *Graves* as a case involving two excess clauses. *Penton*, 601 at 767 n. 7. *But see Graves*, 214 So.2d at 118 ("We ... hold the excess and escape clauses in the two policies to be mutually repugnant and ineffective.").

Regarding a conflict of escape versus pro-rata, we have found no Louisiana case law on point. We note, however, that federal district courts sitting in Louisiana have interpreted Louisiana law as providing that an escape clause trumps a pro-rata clause, and thus that the insurer whose policy includes the pro-rata clause must respond in full up to its limits before the insurer whose policy includes the escape clause, if the latter must respond at all. *See, e.g., Efferson v. Kaiser Aluminum & Chemical Corp.*, 816 F.Supp.

1103, 1119–21 (E.D.La.1993) (citing *Layton v. Land & Marine Applicators, Inc.*, 522 F.Supp. 679 (E.D.La.1981)); *see also Viger v. Geophysical Services, Inc.*, 338 F.Supp. 808, 812 (W.D.La.1972) (adopting a similar ruling in an opinion that does not specify whether the court was applying Louisiana law), *opinion adopted by* 476 F.2d 1288 (5th Cir.1973).

Regarding a conflict of excess versus pro-rata, in *Juan v. Harris*, 279 So.2d 187 (La. 1973), the Louisiana Supreme Court held that an excess clause also conditioned upon the tortfeasor's non-ownership of a covered vehicle did not conflict with an other insurance pro-rata clause in a different policy, and thus that the insurer issuing the policy with the pro-rata clause was obligated to respond in full. *Juan* may present a special case of insurance policies considered non-overlapping. *See* 279 So.2d at 191; *Penton*, 601 So.2d at 765 n. 4 (La.Ct.App.1992); *Truehart*, 884 F.2d at 227–29. It may also present a case in which the satisfaction of an underlying condition triggered a specific, as opposed to an omnibus, other insurance clause. *See Sifers v. General Marine Catering Co.*, 892 F.2d 386, 392–95 (5th Cir.1990) (predicting that the Louisiana Supreme Court would reject an argument that other insurance clauses do not conflict because one policy includes a specific, as opposed to a general, other insurance clause). Under this latter interpretation, the holding of *Juan* means that an escape clause trumps a pro-rata clause, i.e., the policy including the escape clause is not obligated to respond either at all or until the limits of the policy including the pro-rata clause are exhausted. We note that at least one intermediate appellate court has held that excess and pro-rata clauses are mutually repugnant and has ordered overlapping primary insurers to respond pro-rata. *Penton*, 601 So.2d at 768–69 (citing with approval *Lamb–Weston, Inc. v. Oregon Automobile Ins. Co.*, 219 Or. 110, 341 P.2d 110 (1959)).

In the event that the Louisiana Supreme Court decides that the battle of the other insurance clauses results in the imposition of some liability for Commercial Union, the issue again arises as to how Commercial Union is to apportion its $500,000 policy limit

among A & A and Forest. Certified Question Three addresses this issue.

## IV

We AFFIRM in part. Pursuant to La. R.S. 13:72.1.A and Rule XII of the Supreme Court of Louisiana, we CERTIFY four questions to the Louisiana Supreme Court.

CERTIFICATE FROM THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT TO THE SUPREME COURT OF LOUISIANA, PURSUANT TO RULE XII, LOUISIANA SUPREME COURT RULES, TO THE SUPREME COURT OF LOUISIANA AND THE HONORABLE JUSTICES THEREOF:

### I. STYLE OF THE CASE

The style of this case in which certification is made is *Jerry B. Hodgen and Bobby Sue Hodgen v. Forest Oil Corp., et al.*, Case No. 94–41244, United States Court of Appeal for the Fifth Circuit, on appeal from the United States District Court for the Western District of Louisiana.

### II. QUESTIONS CERTIFIED TO THE SUPREME COURT OF LOUISIANA

On the facts recited, we certify the following questions of law certified to the Supreme Court of Louisiana:

Question 1: Under the doctrine of *Meloy v. Conoco, Inc.*, 504 So.2d 833 (La.1987), does the LOIA allow a party found faultless in its capacity as platform owner but culpable in its capacity as time charterer to enforce an indemnity agreement so as to collect those costs attending its defense in its capacity as platform owner?

Question 2: Does *Wilks v. Allstate Insurance Co.*, 195 So.2d 390 (La.Ct.App.1967), correctly state the law of Louisiana that an insurer may not escape or reduce its liability on the basis of an other insurance clause unless the insurers allegedly providing additional coverage are made parties to the litigation?

IF THE RESPONSE IS "YES," PLEASE ANSWER QUESTION 2(a).

IF THE RESPONSE IS "NO," PLEASE SKIP QUESTION 2(a) AND ANSWER QUESTION 3.

Question 2(a): A primary policy insures two insureds, both of which are held liable for a single accident covered by the policy. The costs of defending and indemnifying the two insureds exceeds $500,000, the limit of the insurer's total liability to both insureds. How does Louisiana law require the insurer to apportion the payment of the $500,000 among the two insureds?

PLEASE ANSWER NO FURTHER QUESTIONS.

Question 3: Three insurance policies all provide primary coverage to a first insured suffering a loss. Each policy includes an "other insurance" clause of a different type. The policy including an escape clause has limits of $500,000. The policy including an excess clause has limits of $50,000,000. The policy including a pro-rata clause has limits of $1,000,000. The carrier issuing the policy with $500,000 limits and an escape clause owes an obligation to a second insured arising from the same accident and the same policy. The costs of defending and indemnifying both the first and second insureds exceeds $500,000. The terms of this policy limit the carrier's obligation to a single $500,000 payment to both insureds. How does Louisiana law apportion responsibility among the three carriers for the first insured's loss? *See, e.g., Juan v. Harris,* 279 So.2d 187 (La.1973); *Graves v. Traders & General Insurance Co.,* [252 La. 709], 214 So.2d 116 (La.1968); *Penton v. Hotho,* 601 So.2d 762 (La.Ct.App.1992); *Sledge v. Louisiana Department of Transportation and Development,* 492 So.2d 139 (La.Ct.App.), *writ denied,* 494 So.2d 1176 (1986); *Efferson v. Kaiser Aluminum & Chemical Corp.,* 816 F.Supp. 1103, 1119–21 (E.D.La.1993); *Layton v. Land & Marine Applicators, Inc.,* 522 F.Supp. 679 (E.D.La.1981); *Lodrigue v. Montegut Auto Marine Services,* 1978 A.M.C. 2272 (E.D.La.1977); *Viger v. Geophysical Services, Inc.,* 338 F.Supp. 808, 812 (W.D.La.1972), *opinion adopted by* 476 F.2d 1288 (5th Cir.1973).

This court also certifies to the Louisiana Supreme Court that its answer to these questions will be determinative in this case, resolving all issues among the parties. We note that an affirmative answer to Certified

Question One may require calculation of the costs of defending the suit and the identity of the party that must pay those costs. *See Meloy v. Conoco, Inc.,* 794 F.2d 992 (5th Cir.1986); 504 So.2d 833 (La.1987).