**Jerry B. HODGEN and Bobbie Sue Hodgen**

v.

**FOREST OIL CORPORATION, Ronald J. Doucet, A & A Boats, Inc. and C & G Marine Service, Inc.**

**Civ. A. No. 93–0322.**

United States District Court, W.D. Louisiana, Lafayette–Opelousas Division.

April 26, 1994.

---

See also 862 F.Supp. 1560, 862 F.Supp. 1567.

Jerry G. Jones, Jones & Alexander, Cameron, LA, for plaintiff and intervenor-defendant Jerry B. Hodgen.

Donald Coleman Brown, Todd M. Ammons, Woodley, Williams, Fenet, Palmer, Boudreau & Norman, Lake Charles, LA, for defendants, cross-claimants, third party plaintiffs and intervenor-defendants, Forest Oil Corp., in its capacity as platform owner, and Ronald J. Doucet.

D. Kirk Boswell, Stephen E. Mattesky, Terriberry, Carroll & Yancey, New Orleans, LA, for third-party defendant, Commercial Union Ins. Co. and defendants, cross-defendants, intervenor-defendants and third-party plaintiffs, A & A Boats, Inc. and C & G Marine Service, Inc.

James R. Sutterfield, Bonnie M. Steiner, Nathan L. Schrantz, Hoffman, Sutterfield, Esenat & Bankston, New Orleans, LA, for third-party defendants, Chancellor Ins. Co., Ltd., Yorkshire Ins. Co., Ltd., Cornhill Ins. PLC, Allianz Intern. Ins. Co., Ltd., and Ocean Marine Ins. Co., Ltd.

Edward F. LeBreton, III, Cindy T. Matherne, Rice, Fowler, Kingsmill, Vance, Flint & Booth, New Orleans, LA, for third-party defendant and third-party plaintiff, Albany Ins. Co.

Kevin J. Koenig, Raggio, Cappel, Chozen & Berniard, Lake Charles, LA, for intervenor Aetna Cas. and Sur. Co.

Carl James Hebert, Michael W. Mallory, Evans & Co., New Orleans, LA, for defendant, intervenor-defendant, cross-claimant and third-party plaintiff, Forest Oil Corp. in its capacity as time-charterer.

James A. Cobb, Jr., John F. Emmett, Emmett, Cobb, Waits & Kessenich, New Orleans, LA, for cross-defendants, intervenor-defendants, and third-party plaintiffs, A & A Boats, Inc. and C & G Marine Service, Inc.

Paul B. David, Richard J. Guidry, Broussard, David & Daigle, Layfayette, LA, for cross-defendant and third-party defendant Operators and Consulting Services, Inc.

Muriel O. Van Horn, Lenfant & Associates, New Orleans, LA, for third-party defendant, Aetna Cas. & Sur. Co.

## MEMORANDUM RULING

PUTNAM, Senior District Judge.

This matter arises out of injuries allegedly sustained by plaintiff, Jerry B. Hodgen, on May 5, 1991 in the Gulf of Mexico. He was employed by third-party defendant, Operators and Consulting Services, Inc. ("OCS"), and worked on several fixed platforms owned by defendant, Forest Oil Corporation ("Forest") on the Outer Continental Shelf. Forest time-chartered a vessel from defendants, A & A Boats, Inc. and C & G Marine Service, Inc. ("A & A/C & G"). After a five-day bench trial, the Court took the matter under advisement. We now assign the following reasons for judgment.

### Facts

Plaintiff was employed as a platform operator for OCS on the date of his accident. His duties entailed taking readings from gas charts and meters as well as doing general maintenance on the fixed platforms in the Vermilion Block 255 field. The living quarters for all personnel were on the Vermilion 255–B platform; however, as part of his duties, plaintiff was required to obtain readings on several unmanned platforms in the field, including Vermilion 255–A. He was transported to and from each satellite platform by vessel, or by helicopter if the weather conditions were too rough to make a vessel transfer.

On the morning of the accident, plaintiff and a fellow employee, Randy Ardoin, were lowered by personnel basket from the 255–B platform onto the M/V "Ms. Deborah", owned by A & A/C & G and time-chartered by Forest. They were ferried to the 255–A platform, swung onto the platform by means of a swing-rope transfer and took their readings. Plaintiff was allegedly injured while swinging onto the vessel from the 255–A platform when the vessel came up faster than he anticipated, knocking him down violently on all fours on the aft-deck of the vessel.

Plaintiff brought suit against Forest in both its capacity as platform owner and time-charterer of the vessel, as well as against the vessel owner, A & A/C & G.[1]

### Analysis

#### Negligence

■ As a platform worker on the Outer Continental Shelf, plaintiff is entitled to recover damages under the Longshore and Harbor Worker's Compensation Act ("LHWCA"), 33 U.S.C. 901 et seq., for any injuries he may have suffered due to the negligence of the vessel. Therefore, plaintiff's claim against A & A/C & G as well as his claims for the negligence of Forest, in its capacity as time charterer of the vessel, are governed by 33 U.S.C. 905(b). *Randall v. Chevron U.S.A. Inc.*, 13 F.3d 888, 900 (5th Cir.1994).

■ Plaintiff's claim against Forest in its capacity as platform owner is governed by the law of the adjacent state, which is in this case Louisiana. *Rodrigue v. Aetna Casualty & Surety Co.* 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969).

Plaintiff contends that he was injured due to the negligence of Ronald Doucet, the Forest supervisor in charge of the Vermilion 255 field, in sending him onto the vessel in rough seas. He also alleges that A & A/C & G was negligent because it had no objective safety procedure to determine if the seas were too rough for making passenger transfers, and for allowing the transfer to be made in rough seas. Finally, OCS alleged that Forest was negligent in its capacity as platform owner for failing to put instruments on the platform which would have allowed the personnel on the platform to make an objective determina-

---

1. At the close of the evidence, the Court ruled in Open Court that plaintiff was a borrowed employee of Forest. Therefore, any liability due to Forest's platform fault, if any, is not recoverable by plaintiff.

tion of the height of the seas and the wind velocity.

Defendants allege that plaintiff was himself contributorily negligent in causing this accident. However, we find that no credible evidence was presented on this point at trial, and it will not be addressed any further.

*Negligence of Forest as Time Charterer*

■ Under the Time Charter, Forest's personnel decided where and when the vessel was to be used, and who used it. The crew of the vessel were only responsible for the navigation and operation of the vessel.

■ A time charterer may breach its duty of care if it orders the vessel out in rough seas creating unsafe and dangerous conditions. See *Randall v. Chevron U.S.A., Inc.,* supra, at 898–900, marshalling the authorities on this point.

At the outset, there is a substantial dispute as to what the condition of the sea was at the time of plaintiff's accident. Plaintiff testified that the seas were 8 to 12 feet and his fellow employee Ardoin testified that they were 8 to 10 feet. On the other hand, Ronald Doucet testified that the seas were 5 to 6 feet and Captain Flanders put the figure at 3 to 5 feet. Finally, Rob Perillo, defendant's expert in meteorology, opined that the seas were 3 to 5 feet based on the weather reports in the Gulf of Mexico for that day.

The Court finds the testimony of plaintiff and Randy Ardoin to be the more credible, and that the seas were at least 7 to 9 feet at the time of the accident. Both plaintiff and Ardoin testified that they had to swing from the platform's walkway instead of the boat landing because waves were washing over the landing. Defendants concede that the boat landing is at least 6 ft. above mean sea level, and the walkway is 10 ft. above mean sea level. In addition, both plaintiff and Doucet testified that plaintiff had to change

his clothes when he arrived back at the 255–B platform because his clothes were wet. This is probative evidence of the fact that the seas were quite rough when plaintiff made the transfer.[2]

We find that Doucet was negligent in sending plaintiff onto a vessel in these rough conditions, especially when a helicopter could just as easily have been used and there were no compelling circumstances present.[3]

Plaintiff and Ardoin testified that before boarding the vessel, they were concerned that the seas were too rough and asked Doucet for the helicopter. Doucet told them it was unavailable, and told them to "give the vessel a try" because he had to report the meter readings to the home office. However, Doucet admitted under cross-examination that there was no emergency on the outlying platforms such that the readings could not have been taken later when the helicopter was available. In addition, both plaintiff and Ardoin testified that they did not protest having to use the vessel for their work for fear of losing their jobs. Accordingly, the court finds that the actions of Doucet constituted negligence of Forest Oil as charterer of the vessel, and that such negligence was a proximate cause of the accident and plaintiff's injuries as well, as discussed hereafter.

*Negligence of Forest as Platform Owner*

■ Although this argument was not made by plaintiff, OCS contends that Forest was also at fault for failing to put instruments on the platform that would have allowed the personnel to make an objective determination as to the height of the seas and the wind velocity. Assuming *arguendo* that this constituted negligence, we find that it was not a causative factor in bringing about plaintiff's injuries. The boat landing was also a mechanism by which the personnel could make an objective determination as

---

**2.** We choose to not give as much weight to the testimony of Doucet, Flanders and Perillo for several reasons. Mr. Doucet judged the level of the seas from high up on the platform and not at sea level. Captain Flanders did write in his vessel log that the seas were 3 to 5 ft. on May 5, 1991; however, the time of day was not given. Finally, we give little, if any, weight to the testimony of Mr. Perillo, because there was ample

eyewitness testimony to judge the level of the seas.

**3.** Although the helicopter was unavailable at the time plaintiff and Ardoin left the 255–B platform, it is undisputed that it was available later that day and was in fact used when plaintiff and Ardoin checked the other unmanned platforms in the field.

to the height of the seas, yet Doucet still directed that they go to the 255–A platform by vessel. Accordingly, OCS's argument is without merit.

*Negligence of A & A/C & G*

■ The vessel owner remains responsible for the seaworthiness of the vessel, dangerous conditions on board, navigational errors by the pilot, and negligence by the crew, and a reasonably safe means of ingress and egress for those boarding or leaving the vessel. *Moore v. Philips Petroleum Co.*, 912 F.2d 789, 1991 A.M.C. 2855 (5th Cir.1990).

■ Plaintiff alleges that A & A/C & G breached its duty with respect to the safe ingress and egress to the vessel because it had no objective safety procedure by which to determine if the seas were too rough to allow the swing rope transfer, and by allowing the transfer to be made in rough seas. Captain Flanders testified that it is his policy and that of A & A/C & G's not to allow swing rope transfers if the seas are greater than 6 feet. The captain was under a duty to stop the swing rope transfer as a means of boarding his vessel, which duty was obviously breached because the seas were higher than that when the accident happened; accordingly, we find that A & A/C & G's conduct was negligent, which negligence was also a proximate cause of the accident and plaintiff's injuries as well, as discussed hereafter.

*Medical Causation*

■ Plaintiff did not experience any symptoms immediately after the accident. He testified that he had a tingly feeling in his feet towards the end of the hitch, and he told his wife that he was sore from the fall. When he arrived at home about four days post-accident, plaintiff defecated on himself while walking to his back porch.

He consulted with Darryl Bauer, a chiropractor, for about two months after the accident; however, the numbness in plaintiff's legs continued to move higher, and he lost control of his bladder and bowel functions to the point where he had to wear a diaper. He also had mild pain in the left anterior thigh and a burning sensation across his lower back.

Plaintiff did manage to work two more hitches with OCS and several hitches with Creole Production. However, this work did not entail physical labor and was primarily indoors. Plaintiff testified that he was unable to walk very far without holding a railing to keep from falling.

When plaintiff's symptoms persisted, Dr. Bauer referred plaintiff to Dr. John Raggio, a neurosurgeon, in July of 1991. After performing a neurological exam and making a magnetic resonance imaging (MRI) scan of plaintiff's spine, Dr. Raggio felt that plaintiff was suffering from a thoracic spinal cord dysfunction, and admitted him into the hospital for tests. A myelogram indicated an enlargement of the spinal cord from T–5 down to T–9. After a follow-up MRI several weeks later, Dr. Raggio felt that the thoracic cord was normal and did not show any tumor or growth. Plaintiff told Dr. Raggio that his symptoms were getting worse, so Dr. Raggio referred plaintiff to Dr. David Baskin at Baylor Medical Center in Houston.

Plaintiff first saw Dr. Baskin on August 13, 1991. Dr. Baskin did a neurological exam as well as an MRI, myelogram, and CT scan. The myelogram showed an enlargement of the thoracic spinal cord, the spinal cord in the trunk area, and some mild defects in the cervical region. He was unable to determine whether plaintiff had an inflammatory disease of the spine, multiple sclerosis, or if the spinal swelling was the result of trauma from the accident on May 5, 1991. Later tests ruled out the possibility of multiple sclerosis. Plaintiff experienced some improvement in his bowel and bladder function, and his leg function stayed about the same.[4]

Dr. Baskin did another MRI scan of plaintiff's cervical and thoracic spine on November 21, 1991. He found that plaintiff's previ-

---

**4.** Before his next visit with Dr. Baskin, plaintiff consulted with Dr. Charles April, a diagnostic radiologist, who opined that, after review of the tests conducted by Raggio and Baskin, a contusion in the thoracic cord caused by the fall was the most logical and reasonable explanation for plaintiff's problems. The Court lends minimal weight to Dr. April's testimony because he did not do a neurological exam, and this diagnosis is beyond his field of expertise.

ous abnormality in the cervical spine was gone and that the previous swelling in the thoracic region was also gone. Due to the fact that tumors do not get better on their own, Dr. Baskin feels that plaintiff's problems were most likely caused by a spinal cord contusion from the mid-thoracic region to the brain stem caused by plaintiff's fall on May 5, 1991. An MRI scan on April 21, 1992 showed no changes from the previous scan. Dr. Baskin also rules out the possibility of primary lateral sclerosis because that is a slow, degenerative process of the spinal cord, which is not indicated on plaintiff's MRI scan because there has been no cord shrinkage.

Plaintiff was also seen by Dr. Richard M. Levy, a neurosurgeon, and Dr. William A. Martin, a neurologist, for an independent medical examination. After conducting their own tests and neurological examination, they feel that plaintiff suffers from primary lateral sclerosis, and that his problems were not caused by the fall of May 5, 1991. They base their findings on the fact that plaintiff has significant motor pathway involvement in his arms and neck (above the thoracic region of the spinal cord), and because plaintiff's sensory examination does not corrolate with his motor pathway abnormality. They also feel that a cord contusion due to the fall would have manifested itself immediately, then either stabilized or improved.[5]

We accept Dr. Baskin's opinion that plaintiff's injuries were caused by a spinal cord contusion due to the fall on May 5, 1991. He testified that the reason that plaintiff's sensory examination does not correlate with his motor pathway abnormality is that the swelling of his spinal cord was more anterior than lateral. He also testified that the symptoms from a swollen cord do not necessarily become manifest immediately. Finally, it is undisputed that plaintiff suffered no symptoms before his fall, and in fact passed a pre-employment physical for Creole Production shortly before the fall. It is also undisputed that he began to experience symptoms not more than four days after the fall.

*Apportionment of Fault*

In apportioning fault between the time charterer (Forest) and the vessel owner (A & A/C & G), we must look to the duty owed by each, and assess the relationship between that breach of duty and the resulting injury. We find that the actions of Forest were a far greater causative factor in the accident than that of A & A/C & G. As time charterer, Forest was the party directly responsible for using the vessel for this trip in rough seas. In addition, plaintiff testified that he had no complaints regarding the manner in which Captain Flanders handled the vessel as he swung onto it. Accordingly, we find Forest 85% at fault and A & A/C & G 15% at fault.

*Quantum*

*General Damages*

Dr. Jonathan Strayer, a specialist in physical medicine and rehabilitation, testified that plaintiff suffers from T–12 Fraenkel D paraplegia, a neurogenic bladder and bowel, sexual dysfunction and an abnormal gait with genu recurvatum. Although he has undergone extensive rehabilitation treatment at the Texas Institute for Rehabilitation and Research and continues with physical therapy locally in Sulphur, Louisiana, his condition persists. Plaintiff is able to walk safely for about two hundred feet with bilateral crutches, but is confined primarily to a wheelchair. He also has spasticity in his lower extremities.

Plaintiff must self-catheterize himself every four hours and take medication and eat a certain diet to keep his bowels controlled. He is at risk for multiple bladder infections, and is also sexually dysfunctional.

Plaintiff has been diagnosed as suffering from severe depression as a result of the accident and at times has been suicidal. He is presently under the care of both his psychiatrist and a trauma resolution specialist, who he sees once a week. He takes antidepressants for his condition. Under these facts, we find that plaintiff is entitled to a

---

**5.** Dr. Raggio now concurs in the findings of Dr. Levy and Dr. Martin, although in a letter dated October 14, 1991, he stated that it seemed to him that plaintiff had a spinal cord contusion caused by the fall.

general damage award of $1.5 million, $850,000 past and $650,000 future.

### Past and Future Medical Expenses

### Past Medical Expenses

The parties stipulate that plaintiff has incurred $143,544.23 in past medical expenses as of March 15, 1994, all of which has been paid by intervenor, Aetna Casualty and Surety Company. (Intervenor has also paid $71,170.67 in "wage replacement benefits" to plaintiff as of March 15 for which intervenor claims reimbursement out of plaintiff's recovery. These claims are in dispute and have been separated from plaintiff's main demand for trial at a later date.)

### Future Medical Expenses

Dr. Strayer, plaintiff's physician at Texas Institute for Rehabilitation and Research, devised a "life care plan" estimating plaintiff's future medical needs. Based on Dr. Strayer's recommendations, plaintiff's rehabilitation consultant, Glenn Hebert, and defendant's rehabilitation consultants, Gail A. Cox and Nancy Favalaro, each devised a cost analysis of such a life care plan. We accept the figures given by Cox/Favalaro in their report and find plaintiff's future medical expenses are as follows:

#### (1) Drug and Supply Needs

The Court accepts the figure of $246,384.00 as per the report of Cox/Favalaro. The primary difference between the figures of Mr. Hebert and that of Cox/Favalaro is for the catheter kits. We accept the testimony of Ms. Cox that plaintiff can obtain the kits at a price of $3.00 per kit.

#### (2) Counseling & Therapy

We find that Plaintiff is entitled to an award of $16,212 for his individual counseling, vocational rehabilitation and psychiatric management.

#### (3) Evaluation and Continued Medical Care/Tests

We find that plaintiff is entitled to an award of $25,834.50.

#### (4) Home Maintenance

We find that plaintiff is not entitled to an award for home maintenance because these expenses are inherent in the general damage and lost wage awards.

#### (5) Architectural Renovations (telescoping ramp) and Miscellaneous Expenses

(Eyeglasses, fire alarm, fire extinguisher, cowboy boots with zipper and scooter lift)

We find that plaintiff is entitled to an award of $5,500.00.

#### (6) Orthotics/Prosthetics

Dr. Strayer testified that plaintiff will need bilateral ankle orthroses, a 3–wheel scooter, shower commode chair, wheelchair gloves and a wheelchair.

We find that plaintiff is entitled to an award of $36,777.36.

#### (7) Future Medical and Personal Problems

We find that plaintiff will more likely than not need the following treatment in the future as a result of the accident:

| | Condition/Treatment | Frequency | Cost Procedure/ Treatments |
|---|---|---|---|
| (a) | Urinary Tract Infection | 5 times | $ 590.00 |
| (b) | Joint Replacement | Twice | $53,000.00 |
| (c) | Sexual Dysfunction (Penile Implant) | Once | $18,000.00 |
| (d) | Neoprene arm sleeves | Annual | $ 1,500.00 |
| (e) | Neoprene elbow sleeves | Annual | $ 700.00 |
| | | | $73,790.00 |

In light of the foregoing, we find that plaintiff is entitled to the following award for future medical expenses:

| | | |
|---|---|---|
| (1) | Drug and Supply Needs | $246,384.00 |
| (2) | Counseling & Therapy | $ 16,212.00 |
| (3) | Evaluation and Continued Medical Care/Tests | $ 25,834.50 |
| (4) | Home Maintenance | $ –0– |
| (5) | Architectural Renovations and Miscellaneous Expenses | $ 5,500.00 |
| (6) | Orthotics/Prosthetics | $ 36,777.46 |
| (7) | Future Medical and Personal Problems | $ 73,790.00 |
| | **TOTAL FUTURE MEDICAL EXPENSES** | $404,497.96 |

*Lost Wages*

We accept the testimony of plaintiff's economist Dr. Donald Cornwell that plaintiff's after tax earnings amounted to $24,621.41. We find that the value of his meals offshore was $1,800.00 per year, and that the value of his employer's contribution for insurance was $2,240.00. This amounts to an after-tax wage base of $28,661.41. A period of 2.87 years elapsed between the time of plaintiff's accident to the trial, and his work life expectancy from the time of trial is eleven years. We adopt a below market discount rate of 2.5%. Using these figures we find that plaintiff's past and future lost wages are as follows:

(1) Past lost wages.................... $ 82,258.00
(2) Future lost wages ................. $272.790.00

*Loss of Consortium*

Under the recent Fifth Circuit decision of *Nichols v. Petroleum Helicopters,* 17 F.3d 119 (5th Cir.1994), plaintiff's wife is not entitled to an award for loss of consortium. Her claims are therefore dismissed.

Total damages are as follows:

1. General damages (including pain and suffering, mental anguish, disability)
 Past .............................. $ 850,000.00
 Future ............................ $ 650,000.00
2. Past lost wages.................... $ 82,258.00
3. Future lost wages/earning capacity ...$ 272,690.00
4. Past medical expenses.............. $ 143,544.23
5. Future medical expenses ........... $ 404,497.96

 TOTAL DAMAGES $2,402,990.19

The attorney for plaintiff is to prepare a judgment against Forest Oil and A & A/C & G in accordance with this ruling within ten (10) days. Judgment will not be entered until signed and filed.

In addition, the Court directs the attorneys for all parties except plaintiff to prepare a schedule for the disposal of all remaining issues in the case. There will be no need for the submission of any additional briefs on the indemnity claim by Forest and A & A/C & G against OCS.