TERRI F. LOVE, Judge.
Defendants, the Queen of New Orleans and Russell Ribando, appeal the trial court’s judgment awarding damages of $308,549.92, with interest, to plaintiff, Mu-sacchia for injuries he sustained while attempting to leave the Queen of New Orleans. It is from this judgment that both defendants, the Queen of New Orleans and Russell Ribando appeal. For the following reasons, we affirm the trial court’s finding.

FACTS AND PROCEDURAL HISTORY

In the case at bar it is uncontroverted that on February 17, 1994, plaintiff Nicholas J. Musacchia, Jr. (“Musacchia”) and his cousin and third party defendant, Russell Ribando (“Ribando”) frequented defendants/appellants, the Queen of New Orleans at the Hilton Joint Venture, Hilton Hotels Corporation, Hilton New Orleans Corporation, and New Orleans Paddle-wheels, Inc. (collectively “Queen of New Orleans”). The Queen of New Orleans was a casino gaming vessel, operating | ¡.from the Poydras Street Wharf adjacent to the Riverwalk shopping mall in New Orleans. Although the Queen of New Orleans was built with elevator access, the elevator was not yet operational during its first weeks of business. The vessel could only be accessed by a boarding ramp between the vessel and a shore side boarding structure, which required patrons to either climb a stairway up the boarding structure from the wharf, or come down that stairway from the top of the boarding structure, which was reached from the Mezzanine level of the Hilton Hotel. Musacchia, who was wheelchair bound, received assistance from the employees of the Queen of New Orleans in boarding and leaving the vessel. It was upon leaving the vessel that Musacchia incurred injuries as a result of an accident on the stairway at the Queen of New Orleans.
The plaintiff and defendants all provide differing accounts as it pertains to the occurrence and causation of accident that occurred on February 17, 1994. Musacc-hia avers that on February 17, 1994, he and his cousin Ribando decided to visit the Queen of New Orleans, which had only been open for a couple of weeks. Upon their arrival, they were informed that the elevator, which would deliver them from the Mezzanine level of the Hilton Hotel to the boarding ramp level of the Queen of New Orleans, was not yet completed. Mu-sacchia agreed to allow three casino employees to roll him, in his wheelchair, down the flight of stairs from the hotel to the boarding ramp level. Musacchia avers that several steps down, one of the men holding him lost grip and his chair fell backwards onto the stairs; however, Mu-sacchia was able to support himself with *904 the railing so that he did not fall. Musacc-hia further testified that Ribando had attempted to assist the casino employees with bringing Musacchia down the steps, but was prevented from assisting by the casino employees. Musacchia contends that he was carried down lathe remainder of the stairs without incident and both he and Ribando boarded the vessel and gambled for approximately three hours. The two men decided to leave around 11:00 p.m., at which time they met a couple of employees on the boarding ramp who told Musacchia that they planned to bring him down two flights of stairs to the parking lot rather than up one flight to the Hilton Mezzanine level. Musacchia insisted they carry him up the same flight of stairs they used before because it was a shorter distance and he felt it was safer. Musacchia turned his wheelchair around and backed up to the bottom step. Two vessel employees positioned themselves in front of him, and he was waiting for a third to come around from behind when the employee on his right side bent down and picked up on the front, right corner of his chair, causing the chair to roll forward and Musacchia to fall backwards, striking his neck and back on the cement steps.
The Queen of New Orleans alleges that Musacchia and Ribando approached the vessel boarding area; they were advised that the boarding structure elevator was not yet operational. Musacchia chose to be carried down the boarding structure from the Hilton Mezzanine level by three male casino employees. Shortly after 11:00 p.m., Musacchia and Ribando decided to leave and approached the boarding ramp. Jacques Legrand, (“Legrand”) a Queen of New Orleans deckhand, was stationed on the vessel at the boarding ramp and told Musacchia to hold up a moment because he needed help leaving the vessel. Legrand testified the casino employees had been trained in the assistance of wheelchair bound patrons, specifically including the carrying of such patrons. Both Michael Petit (“Petit”) and Ernest Bandy (“Bandy”), also Queen of New Orleans employees, were in the vicinity and offered to assist. An employee was positioned on both sides of Musacchia’s wheelchair, while Ribando positioned himself behind the chair. Defendants aver that before Petit and Bandy were ready, Riban-do pulled the chair from under Musacchia, causing Musacchia to fall forward. Bandy caught Musacchia before he could fall all the way to the deck and placed him back in his wheelchair. Petit testified that, before they attempted to carry Musacchia, he radioed for two other casino employees to assist, so there would be five casino employees to carry Musacchia up the stairs. However, before they were in place, Ri-bando lifted up Musacchia’s chair, causing him to fall from his chair. Petit prepared an accident report that evening, which was consistent with this version of the event.
Third party defendant, Ribando testified to a different version of events, claiming that he was not involved in the allegedly injurious lift, but was merely standing several steps behind Musacchia, watching the Queen of New Orleans’ employees.
The trial court held that the Queen of New Orleans’ conduct constituted breach of its duty to provide a safe manner of ingress and egress from its vessel, and that his negligent conduct caused injury to plaintiff.

LEGAL ANALYSIS

Both defendants, the Queen of New Orleans and Russell Ribando appeal the judgment of the trial court. On appeal, the Queen of New Orleans at the Hilton Joint Venture, Hilton New Orleans Corporation, Hilton Hotels Corporation and New Orleans Paddlewheels, Inc., (the Queen of *905 New Orleans) allege four assignments of error:
1.The trial court erred in holding that the Queen of New Orleans was negligent, and that any such negligence was a legal cause of this accident;
2. The trial court erred in failing to asses any comparative fault to the Musacchia;
3. The trial court erred in assessing only 10% fault to Ribando; and
4. The trial court erred in awarding excessive damages;
Defendant Russell Ribando also alleges four assignments of error:
1. The trial court erred in assessing any fault to Ribando;
2. The trial court erred in awarding Musacchia damages;
3. The trial court erred in applying maritime law to the Third Party Demand asserted by defendants, the Queen of New Orleans, against Ri-bando; and
4. The trial court erred in awarding prejudgment interest against Riban-do from the date Musacchia filed suit and not when Ribando was made a party.
The issues presented in this appeal consist primarily of questions of fact. The Louisiana Supreme Court announced a two-part test for the reversal of a fact finder’s determinations:
1. The appellate court must find from the record that a reasonable factual basis does exist for the finding of a trial court, and
2. The appellate court must further determine that the record establishes that the finding is clearly wrong or manifestly erroneous.
Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Stobart v. State of Louisiana, Through the DOTD, 617 So.2d 880 (La.1993).
The reviewing court must review the record in its entirety to determine whether the trial court’s finding was clearly wrong or manifestly erroneous. Id. The Louisiana Supreme Court has emphasized that:
the reviewing court must always keep in mind that ‘if the trial court of jury’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.
Housley v. Cerise, 579 So.2d 973 (La.1991), (quoting Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990)).
The rationale for this well-settled principle of review is based not only upon the trial court’s better capacity to evaluate live witnesses, as compared with the appellate court’s access only to a cold record, but also upon the proper allocation of trial and appellate functions between the respective courts. Thus, where two views of the evidence exist, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Watson v. State Farm Cas. Ins. Co., 469 So.2d 967 (La.1985).

First Assignment of Error

Defendants allege, in their first assignment of error, that the trial court erred in holding that the Queen of New Orleans was negligent, and that any such negligence was a legal cause of this accident. The trial court held that:
The duty of the Queen of New Orleans is [sic] to provide a safe means of ingress and egress to its vessel, which duty it breached.
Musacchia alleges that the Queen of New Orleans owed a duty to its passengers, breached its duty with respect to the *906 safe ingress and egress to the vessel, and that adoption of a procedure to carry wheelchair bound patrons up and down flights of stairs did not avoid breach of such a duty. Defendants, the Queen of New Orleans, aver that deciding to carry wheelchair patrons up or down flights of stairs did, not breach the duty owed of safe ingress and egress to patrons of the Queen of New Orleans. They further argued that the duty owed was to provide a safe manner of ingress and egress to “reasonable patrons” and wheelchair patrons are not to be considered reasonable patrons. We cannot disagree more with this argument, as evidenced by this opinion.
It is a settled principal of general maritime law that a ship owner owes a duty of exercising reasonable care toward those lawfully aboard the vessel who are not members of the crew. This duty of reasonable care encompasses a ship owner’s duty to provide a safe manner of ingress and egress from his vessel. Gatson v. G.D. Marine Services, Inc., 93-0182, p. 6 (La.App. 4 Cir. 1/19/94), 631 So.2d 547, 553. In Alpert v. Zim Lines, 370 F.2d 115 (2nd Cir.1966), the court, citing American President Lines, Ltd. v. Lundstrom, 323 F.2d 817, 818 (9th Cir.1963), held that
A passenger carrier has a duty ‘to exercise extraordinary vigilance and the highest skill to secure the safe conveyance of the passengers’, Allen v. Matson Navigation Co. (9th Cir.1958), 255 F.2d 273, 277, and if it knows that a passenger has physical disabilities it must exercise such higher degree of care — including giving special assistance — as is reasonably necessary to insure that passenger’s safety in view of his disabilities.
The court in Alpert, further opined, “whether negligence exist may depend upon a passenger’s special needs and the ship’s knowledge thereof.” Alpert, 370 F.2d at 116. Passengers injured aboard a vessel have a cause of action in admiralty if the injury is caused by negligence imputed to the owner or operator of the vessel. Monteleone v. Bahama Cruise, 838 F.2d 63 (2nd Cir.1988). In Shofstah et al. v. The Board of Commissioner of the Orleans Levee District, et al. (2002-0018) (La.App. 4 Cir. 1/015/03), 841 So.2d 1 rehearing denied 1/15/03; writ denied 9/26/03, this court referenced its opinion rendered in Sutton v. Duplessis, 584 So.2d 362 (La.App. 4th Cir.1991), in which this court held:
Negligence is actionable only where it is both a cause in fact and a legal cause of the injury. Legal cause requires a proximate relation between the actions of a defendant and that harm which occurs, and such relation must be substantial in character. Sinitiere v. Lavergne, 391 So.2d 821 (La.1980).
The negligence imputed to the Queen of New Orleans is their failure to provide a safe means of ingress and egress for all patrons. Adopting a procedure requiring wheelchair bound patrons to be carried up and down flights of stairs is breach of the duty owed of safe ingress and egress. The act of carrying wheelchair bound patrons was not only both a cause in fact and a legal cause of the injuries Musacchia sustained, but also such negligence was a proximate cause of the accident and Mu-sacchia’s injuries. The Queen of New Orleans opened its doors to all patrons with the knowledge that the elevator was not yet operational. Although, the Queen of New Orleans, expecting wheelchair patrons to frequent the gaming vessel, trained their staff in the adopted procedure of manually carrying wheelchair bound patrons up and down stairs for boarding, this method of ingress and egress, by its very nature, is unsafe. During direct examination, Jacques Legrand, *907 an employee of the Queen of New Orleans, testified:
A: Did you receive any training how to assist wheelchair-bound passengers?
Q: Yes.
A: Would you tell the Court what type of training you received?
Q: Basically, we take a deckhand and we self-practiced with a wheelchair both with a ramp, mainly with a ramp at the time, which goes from the gangway to the vessel itself when it’s docked.
When asked whether the employees of the Queen of New Orleans were trained or practiced carrying wheelchair-bound passengers up and down specifically on the stairway of the boarding structures, Le-grand testified
Q: Yes, we did. We had to because'of the situation at the time we first opened up.
A: And the situation at the time you first opened us was?
Q: It was a little bit of a big deal because we didn’t have the elevators ready the first week or two. I believe the elevators were not complete. And there was a flight of stairs. One flight up from the dock level. One flight down from the lobby level. One flight down from the lobby level. And we knew we would have to be moving passengers possibly up and down these flights of stairs.
The vessel owner remains responsible for the seaworthiness of the vessel, dangerous conditions on board, navigational errors by the pilot, and negligence by the crew, and a reasonably safe means of ingress and egress for those boarding or leaving the vessel. Hogden v. Forest Oil Corporation, 93-0322 (W.D.La.4/26/94), 862 F.Supp. 1552, 1557, citing Moore v. Phillips Petroleum Co., 912 F.2d 789, 1991 A.M.C. 2855 (5th Cir.1990). We find that the Queen of New Orleans was negligent in choosing to accommodate wheelchair patrons by carrying them up and down flights of stairs to enable them to board the vessel, especially when alternative means could have just as easily been used and there were no compelling circumstances present. The Queen of New Orleans opened their doors for business with the knowledge that the elevator was not yet operational and with the knowledge that wheelchair patrons were also invited to frequent the vessel. We further find, as the trial court did, that this method of loading and unloading passengers was inherently risky and unsafe, and such was brought to the attention of the Queen of New Orleans upon the boarding of Mu-sacchia, as exemplified by the testimony that Musacchia was nearly dropped down the stairs while boarding the vessel several hours prior to his accident.
After careful review of the record and jurisprudence, we find that the Queen of New Orleans owed a duty to its passengers to provide a safe means of ingress and egress. We also find that the Queen of New Orleans breached this duty and as a result of such breach, we find that the Queen of New Orleans’ conduct was negligent, which negligence was also a proximate cause of the accident and plaintiffs injuries as well, as discussed hereafter. Therefore, the trial court was not manifestly erroneous in finding the Queen of New Orleans negligent. This assignment of error is without merit.

Second Assignment of Error

In the appellant’s second assignment of error, the defendants assert the trial court erred in failing to attribute any fault to Musacchia. Allocation of fault is a factual finding, which an appellate court may not disturb unless the finding is demonstrably wrong. Clement v. Frey, 95-1119 (La.1/16/96), 666 So.2d 607. Factual *908 finding cannot be overturned in the absence of manifest error. Stobart v. State of Louisiana, Through the DOTD, 617 So.2d at 882. The issue to be resolved by this court is not whether the trial court was right or wrong, but whether the fact finder’s conclusion was a reasonable one. Id.
At the trial on the merits, the appellants had the burden of proving that Musacchia was comparatively negligent for the cause of the accident. The trial court held:
the Court does not find that plaintiff, Musacchia, was guilty of comparative negligence, either for his decision to purchase light-weight wheelchair which did not have rear handles, or his agreement to board the vessel once he learned that there was no elevator.
In After the trial court made the determination that defendants were negligent, the burden then shifted to defendant to prove that it was more probable than not that plaintiff himself was comparatively negligent. Gaston v. G & D Marine Services, Inc., 93-0182 (La.App. 4 Cir. 1/19/94), 631 So.2d 547.
Defendants, the Queen of New Orleans, aver that Musacchia should be held responsible for the injuries he sustained as a result of being carried by the Queen of New Orleans’ employees. The Queen of New Orleans contends that because of his disability, Musacchia was left with three options after being informed that the elevator was not functional: (1) allow himself to be carried in his wheelchair; (2) negotiate the stairs himself by pulling himself up or down the stairs using his upper body strength, or by using the handrails, or (3) leave the casino to pursue entertainment elsewhere. The Queen of New Orleans aver that because Musacchia chose to be carried down the boarding structure from the Hilton Mezzanine level, instead of crawling up the stairs or going home, Mu-sacchia should be allocated some fault.
Negligence cannot be imputed to Mu-sacchia simply because upon his arrival, he learned that there was not an elevator to assist him in boarding, and allowed the Queen of New Orleans’ employees to assist him in boarding the vessel. Although Mu-sacchia testified that he allowed the three employees to bring him down the flight of stairs so that both he and Ribando could board the Queen of New Orleans; that upon his egress, he informed the employees of the Queen of New Orleans that he wanted to go back up the one flight of stairs the employees used to board the vessel, rather than traverse two flights of stairs, such is not sufficient to establish that Musacchia was negligent. Defendants aver that Musacchia was negligent in allowing the crewmembers to carry him up the flight of stairs in a chair that had no rear handles; however, Musacchia testified on cross-examination that on the night of the incident he was not in a wheelchair that had handles on the back. The crew-members were better capable of determining whether they were able to assist Mu-sacchia up and down the stairs, based on their training. The Queen of New Orleans’ employees did not inform Musacchia otherwise. Defendants aver that Musacc-hia should be assessed some fault, based on the fact that Musacchia did not assist the crewmembers by giving instructions of how he should be lifted. Although Mu-sacchia testified that he did not give any instructions to the crewmembers, the Queen of New Orleans trained their employees in the procedure of lifting and carrying wheelchair bound patrons up and down flights of stairs. Furthermore, negligence cannot be imputed to Musacchia for allowing the Queen of New Orleans’ crewmembers to perform their jobs according to the training they received. *909 Considering the record before us, we cannot say the trial court’s determination that Musacchia was not at fault in the accident was “manifest error.” Accordingly, this assignment is without merit.

Third Assignment of Error

In its third assignment of error, appellants allege that the trial court erred in assessing only 10% fault to Ribando. In apportioning fault between the Queen of New Orleans and third party defendant, Ribando, we must look to the duty owed by each, and assess the relationship between that breach of duty and the resulting injury. Hodgen v. Forest Oil Corp., 862 F.Supp. 1552 (W.D.La.1994). Allocation of fault is a factual finding, which an appellate court may not disturb unless the finding is demonstrably wrong. Clement, 95-1119, 666 So.2d 607. The trial court held that
After reviewing the evidence and assessing the demeanor and credibility of the witnesses, the Court further finds that it was more probably than not, that the third party defendant, Russell Ri-bando Jr., did in fact participate in the effort to lift plaintiffs wheelchair up the stairs.
As the Queen of New Orleans was the party directly responsible for ensuring a safe manner of ingress and egress for its patrons, breach of such duty was the proximate cause of the accident and plaintiffs injuries as well. Not only was this method of loading and unloading passengers inherently risky and unsafe, but the duty the Queen of New Orleans owed, which was breached, easily encompasses the risk that such accidents and injuries will result. The trial court found that, despite testimony by Musacchia and Ribando, Ribando attempted to assist the Queen of New Orleans’ employees, in the lifting of his friend, but his involvement was minimal and could have been completely avoided had the Queen of New Orleans adopted safer procedures for loading and unloading passengers.
Accordingly, we find that the trial court’s allocation of fault to the Queen of New Orleans at 90% and Ribando at 10% was not demonstrably wrong.

Fourth Assignment of Error

In its fourth assignment of error, appellants assert that the damages awarded to plaintiff are excessive. Thus, we must determine whether an award of $808,549.92, is an abuse of the trial court’s discretion. The trial court has great discretion when assessing damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993). Each case is different, and the adequacy of the award should be determined by the facts or circumstances particular to the case under consideration. Id. Thus, the initial inquiry is whether the award for the particular injuries and their effects, under the particular circumstances, on the particular injuries person is a clear abuse of the “much discretion” vested in the judge or jury. Joseph v. City of New Orleans, 2002-1996 (La.App. 4 Cir. 3/5/03), 842 So.2d 420. In reviewing general damages, an appellate court is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Id. The standard for review is nonspecific, and only when the award, in either direction, is beyond that which a reasonable trier of fact could assess for effects of a particular injury to a particular plaintiff under particular circumstances, should an appellate court increase or reduce award. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977). The trial court awarded Musacchia $100,000 in past general damages; $100,000 in future general damages; $53,749.92 in past medical expenses; $50,000 in future medical ex *910 penses; and $4,800 in houseeleaning expenses.
Dr. Clifford, a neurosurgeon who treated Musacchia, testified:
... while it was quite possible that while he was being carried down steps in the wheelchair and was subsequently dropped, he did sustain sufficient trauma to the back of his neck in a flexion type of injury that could have made these problems significantly symptomatic. Whether or not there were lesions that needed surgical intervention at that point in time remained to be seen.
Dr. Clifford was questioned as to the recommendation of surgery for Musacchia, he testified:
Q: ... there was a chance that he could be — a significant chance that surgery could make him worse and you recommended that he try to live without undergoing surgery?
A: Yes.
Dr. Clifford further provided that:
Q: Based on your treatment, evaluation of Mr. Musacchia, and of course, based on the history given to |1syou by the patient, would you agree that, again using the legal standard that we use of more probably than to, that the complaints that you observed and treated Mr. Musacchia for arose from the accident that he described to you of February 1994?
A: Yes.
Q: In your treatment of Mr. Musacchia did you find him to be truthful and forthright?
A: I did.
Although defendants aver, through the testimony of Musacchia’s neighbor that Mu-sacchia suffered subsequent falls Dr. Clifford testified that the amount of trauma sustained in any subsequent fall to the incident at the Queen of New Orleans, must be quantified and sufficiently significant to affect his opinion. Dr. Clifford was not the only medical testimony submitted to the trial court. In addition to Dr. Clifford’s testimony, Dr. Jarrott, who is also a neurosurgeon, gave supporting testimony to that of Dr. Clifford’s in that Musacchia had bulging cervical discs at C3^1 and C5-6, and that these bulges cause not only ventral flattening of the thecal sac, but dorsal displacement of the spinal cord. Dr. Jarrott further testified that
The accident of September (sic) 17, '94 is thought to have aggravated a preexisting condition possibly in part by the mechanism of damage to the L2-3 disc.
He further testified that Musacchia has intractable pain that is appropriately treated with prescription medication.
Neurologist Dr. Carlos A. Garcia, defendants’ medical expert evaluated Musacchia on December 20,2000. Although he testified that he did not believe that the fall could be responsible for the long period of time for which Musacchia has complained of back and neck pain, Dr. Garcia testified that he was not aware of any medical records documenting any back or neck treatment for Musacchia prior to the accident of February 17, 1994. He further testified that Musacchia fell into the category of persons who are, for whatever reason, more severely psychologically affected by a certain trauma than an average person might be.
During direct examination Musacchia testified about his life prior to the accident on February 17, 1994.
Q: Prior to the accident how did you get by living on your own in a wheelchair?
A: I just did my normal, daily duties and took care of myself. I cooked, cleaned my house, cleaned my yard.
*911 Q: What other kinds of activities could you do before?
A: I did some type of construction using power tools, gardening. Just anything anybody had to do like painting. Anything anybody had to do I would get involved with it.
Musacchia further testified that prior to the accident, he never had any neck or back pain before, other than when he would get out of his wheelchair and sit on hard surfaces for prolonged periods of time. He further testified that the pain would subside after he returned to his wheelchair. Musacchia’s neighbor, Gerald Mire (“Mire”), testified that prior to the February 17, 1994 accident Musacchia would help him on several occasions with siding, painting, and sanding the flooring in Mire’s home. Mire further testified that now, Musacchia very seldom goes outside. Mire testified that Musacchia had always been active. He testified that he used to see Musacchia out in the yard with the flowers. When Musacchia was questioned as to how he spends his days now, he testified:
A: Sitting at home, basically, doing nothing. Sitting in front the computer. I go to card game site like Hearts. I go in there and play Hearts to try and keep my mind occupied and keep it off the pain.
Q: Do you get out as much as you used to before?
A: No, sir. No, sir. I — the left probably four or five months going to the doctor.
Musacchia further testified:
I did everything for myself. Clean the house, cooked, washed dishes, washed clothes, swept, mop, clean my yard, and [sic] rake the leaves in my yard.
Musacchia gave uncontroverted testimony that after the accident, he had to employ a weekly housekeeper, incurring approximately $4,800 in cleaning costs.
Neurosurgeons Dr. Clifford and Dr. Jar-rott both testified as to the future medical expenses that Musacchia might incur. Dr. Clifford testified that Musacchia would more likely than not require future two-cervical disc surgery, and Dr. Jarrott testified that Musacchia will probably require future lumbar surgery.
It is undisputed that Musacchia was injured when the defendants dropped him on the cement steps. Based on the medical testimony given, the injuries Musacchia suffered caused him to endure great pain and suffering. After careful review of the totality of evidence presented to the trial court on Musaechia’s damages, we find the trial court’s award of $308,549.92 did not constitute a clear abuse of its discretion.

Third Party Defendants Assignments of Error

We find that third party defendant’s first and second assignments of error were previously addressed in our legal analysis of the Queen of New Orleans’ second and third assignments of error; therefore, further discussion is not warranted. However, where third party defendant alleges in his third and fourth assignments of error that the trial court erred in applying maritime law to the third party demand asserted by defendants against Ribando and in awarding prejudgment interest against Ribando from the date the plaintiff filed suit, discussion is warranted.
Determination of the question of whether a tort is “maritime” and thus within the admiralty jurisdiction of the federal courts has traditionally depended upon the locality of the wrong. Brodtman, et al. v. Duke, 96-0257, p. 4 (La.App. 4 Cir. 2/11/98), 708 So.2d 447, 452 citing *912 Executive Jet Aviation, Inc. v. City of Cleveland, Ohio, 409 U.S. 249, 252-253, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972). Generally federal maritime jurisdiction is invoked whenever an accident occurs on navigable water and in furtherance of an activity bearing a significant relationship to a traditional maritime activity. Id., citing Offshore Logistics v. Tallentire, 477 U.S. 207, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986). However, the Queen of New Orleans asserts and the trial court reasoned that the “[p]laintiff and defendants have stipulated and agreed that general maritime substantive law is applicable to this case.” We therefore find, that the trial court did not err in applying general maritime law.

CONCLUSION

For the aforementioned reasons, we affirm the judgment of the trial court.
AFFIRMED.